EDWARD L. KELLAN, Appellant, *vs.* WILLIAM KELLAN
*et al.* Appellees.

*Opinion filed April 19, 1913.*

1. WILLS—*verdict in will contest case has force of a verdict in a suit at law.* In a suit, under the statute, to contest a will the jury's verdict has the same force and effect as a verdict in a suit at law under a like state of facts, and when such verdict is not manifestly against the weight of evidence the courts are bound by it in the same manner and to the same extent as in a suit at law.

2. SAME—*when evidence that witness protested against moving testatrix from hospital is immaterial.* Offered evidence in a will contest case that the witness objected to the removal of the testatrix from the hospital and told the nurse the Mother Superior had said she should not be removed is immaterial, where the evidence shows the testatrix was very anxious to be removed and that both her attending physicians consented.

3. SAME—*when exclusion of proper evidence will not reverse.* Exclusion of evidence offered by the contestants which was competent on the issue of want of testamentary capacity will not justify reversing the decree, where the evidence preponderates strongly in favor of the proponents on that issue and the nature of the excluded evidence is such that it is highly improbable that it would have brought any change in the verdict.

4. SAME—*when postal-card written by beneficiary is not admissible.* Where it is charged that a will cutting off the contestants and leaving the bulk of the estate to four nephews and nieces, in equal shares, was procured by undue influence, a postal-card written by one of such nephews containing an admission that he had had his aunt "fix things" so as to cut off the contestants with one dollar, is not admissible, as such admission is not binding upon the other beneficiaries. (*Cunniff* v. *Cunniff,* 255 Ill. 407, adhered to.)

5. SAME—*what testimony as to mental condition is not objectionable.* Witnesses for the proponents may be permitted to state that they did not observe any change in the mental condition of the testatrix, and that her mental condition, comparing it at one given time with another given time, was the same.

6. SAME—*certified transcript of testimony of subscribing witnesses is admissible on contest though they testify on the contest.* Under section 7 of the Wills act a certified copy of the testimony of the subscribing witnesses at the probate of a will is admissible in a suit to contest the will, notwithstanding the witnesses have already testified in the contest case to the same effect.

7. SAME—*contestants cannot complain of instruction favorable to them.* Contestants cannot complain of an instruction, given at the request of the proponents, stating that if the testatrix had capacity to transact ordinary business she was capable of executing a valid will, since such statement is favorable to the contestants in requiring a higher degree of mental capacity than is necessary to execute a valid will.

8. SAME—*instruction that claims presented cannot be affected by outcome of suit is proper.* In a will contest case an instruction that the claims presented against the estate by the doctors and nurse who attended the testatrix could not be affected by the outcome of the suit is proper, without regard to the alleged friendliness of the executor to the claimants, as the acts of an executor done in good faith, with the approval of the court, under a will which is subsequently set aside, are valid and binding on the estate.

9. SAME—*when instruction as to undue influence is proper.* An instruction for the proponents which states that the fact that the testatrix, before making the will, was taken from the hospital to the home of one of the beneficiaries of the will does not raise any presumption of undue influence but that undue influence must be proven by a preponderance of the evidence, is not improper.

10. SAME—*when instruction is properly refused as shifting the burden of proof.* An offered instruction stating that if the jury found the will was procured to be drawn by one of the chief beneficiaries such circumstance required proof that the executrix was not imposed upon in making the will is properly refused, as shifting the burden of proof on that issue from the contestants to the proponents.

APPEAL from the Circuit Court of Cook county; the Hon. OSCAR E. HEARD, Judge, presiding.

EDGAR L. MASTERS, and W. G. WISE, for appellant.

JOSHUA R. H. POTTS, B. G. RICHARDS, and A. A. OLSON, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

Edward L. Kellan, the appellant, and Henry E. Kellan and Ellen Newton, heirs-at-law of Mary E. Newport, deceased, filed their bill of complaint in the circuit court of Cook county against the remaining heirs, legatees and devi-

sees of said deceased to contest the validity of an instrument which had been admitted to probate by the probate court of Cook county as the last will and testament of said Mary E. Newport. As grounds for setting aside the probate of the will it was alleged that the testatrix was of unsound mind and memory at the time she executed said will, and that she was unduly influenced to make the will by Laura Thompson and Louis H. Kellan, two of the defendants to the bill. After the cause had been brought to issue by the filing of answers and replications an issue at law was made up whether the instrument in controversy was the will of Mary E. Newport, and this issue was submitted to a jury, which upon a trial returned a verdict in favor of the proponents. This verdict was set aside and a new trial granted upon motion of the contestants. Thereafter the issue was again submitted to a jury, and the second trial also resulted in a verdict sustaining the validity of the will. After overruling a motion for a new trial the court entered a decree in accordance with the verdict, finding and adjudging the instrument in controversy to be the last will and testament of Mary E. Newport and ordering complainants to pay the costs of suit. From that decree Edward L. Kellan, one of the complainants, has prosecuted this appeal.

Appellant first contends that the verdict of the jury and the decree of the court are contrary to the evidence, but with this contention we cannot agree. In contested will cases arising under our statute the verdict of the jury is given the same force and effect as a verdict in a case at law under a like state of facts, and when such verdict is not manifestly against the weight of the evidence the court is bound by it in the same manner and to the same extent as in a case at law. *Calvert* v. *Carpenter,* 96 Ill. 63; *Hill* v. *Bahrns,* 158 id. 314; *Moyer* v. *Swygart,* 125 id. 262; *Smith* v. *Henline,* 174 id. 184; *Hurley* v. *Caldwell,* 244 id. 448.

Mary E. Newport at the time of her death was a widow sixty-eight years of age and resided in the city of Chicago. Her nearest relatives were nephews and nieces, of whom the complainants and seven of the defendants to the bill, including Louis Kellan and Laura Thompson, were children of Henrietta Kellan, a deceased sister, and the remaining defendants were children of Louis Oest and Henry Oest, deceased brothers. Laura Thompson and Louis Kellan had in the past made their home with Mrs. Newport, as also had their brother Arthur Kellan and their sister Dora Clark. Laura Thompson left the home of Mrs. Newport about sixteen years prior to the latter's death and was soon afterwards married to a man objectionable to Mrs. Newport and did not thereafter visit her, although both lived in the city of Chicago. Louis Kellan left the city of Chicago and located at Iron Mountain, Michigan, two or three years before Mrs. Newport's death, and he was the last of the nephews and nieces to leave her home. At the time of Mrs. Newport's death Edward Kellan also resided in Chicago. From the testimony it appears that Mrs. Newport had previously formed a dislike for him, because, as she stated to some of her acquaintances who testified on the trial, he had wrongfully used money which had been left to Louis Kellan, Arthur Kellan, Laura Thompson and Dora Clark by their father upon his death. Ellen Newton lived at Crown Point, Indiana, and had been a favorite with Mrs. Newport until a short time before the latter's death, when Mrs. Newport became offended, while on a visit to Mrs. Newton, because the latter's husband wanted her to deed her property to Mrs. Newton, and upon her refusal to do so in effect told her she was no longer wanted at their home.

Mrs. Newport had for twenty years prior to her death been afflicted with a goitre, which gradually increased in size, until in May, 1909, it had become so large that it pressed heavily upon the trachea and caused great difficulty in breathing. Dr. James A. Printy, a physician practicing

in Chicago, who had known Mrs. Newport for twenty years, was on May 27, 1909, called in to see her. According to his testimony he found her quite sick, her principal complaint being that she had difficulty in breathing. After a few visits he called in Dr. Carl Wagner, a surgeon of Chicago, for a consultation. Dr. Wagner found Mrs. Newport sitting up in bed and gasping for breath as a result of the pressure of the goitre upon the trachea. He advised an immediate operation for the removal of the goitre and directed her to go to the Columbus Hospital, in Chicago, as soon as possible. Mrs. Newport had in her possession some papers and securities belonging to Louis Kellan, and after being told that an operation would be necessary, expressed to Mrs. Butts, a friend who had come to see her, considerable concern over the safety of these papers in case of her death and a desire to notify Louis Kellan of her illness. Mrs. Butts offered to write to Louis Kellan, but Mrs. Newport concluded that she would send for Edward Kellan and have him come to her home and write the letter to Louis and attend to such other business as required attention at that time. She accordingly requested Mrs. Butts to inform Edward Kellan that she was sick and wanted to see him on business. Mrs. Butts delivered this message and Edward Kellan went to the home of Mrs. Newport. Whether he wrote the letter to Louis Kellan is not disclosed by the evidence. He did, however, make arrangements for removing Mrs. Newport to the hospital, and on May 31, 1909, she was taken to Columbus Hospital in an ambulance, Edward Kellan accompanying her. Upon her arrival at the hospital Edward Kellan procured Richard L. Wernecke, a real estate and insurance agent, who had once made a loan to Mrs. Newport and who insured her buildings, to go with him to the hospital for the purpose of drawing a will for Mrs. Newport. After talking with her, Wernecke suggested that an attorney be employed to draw the will, to which Mrs. Newport consented and told Wernecke what

disposition she desired to make of her property. On the same day Wernecke had the will drawn by an attorney and took it to the hospital, where Mrs. Newport executed it in the presence of witnesses, one of them being Sarah Geary, the nurse who attended upon Mrs. Newport from the time she arrived at the hospital until her death. By this will, after providing for the payment of debts, etc., Mrs. Newport bequeathed to Edward Kellan $200, to Ellen Newton $200, and directed that the remainder of her property should be divided into three equal parts,—one part to be divided equally among the children of her brother Louis Oest, one part among the children of her brother Henry Oest, and the remaining part among the children of her sister, Henrietta Kellan. Wernecke was named as executor of the will. Sarah Geary, the nurse, testified that when Wernecke came to the hospital with the will Mrs. Newport requested her to remain in the room and listen to the reading of the will; that after Mrs. Newport came out from under the effects of the anæsthetic she asked the nurse whose name was mentioned in the will, and upon being informed that Edward Kellan's name was mentioned, threw up both hands and said, "He is the last man on earth I would want to get to spend my money; he spent the minor children's money and he won't have the pleasure of going through mine," and requested the witness to send Louis Kellan a postal-card and notify him that she was sick at the hospital and had undergone an operation.

Dr. Printy and Dr. Wagner both testified that Mrs. Newport obtained almost immediate relief from the difficulty in her breathing as a result of the operation and made a good recovery from the effects of the operation, and that within twelve or fifteen days she was able to leave her room and be taken to the park for fresh air. She then became very anxious to leave the hospital, and on June 24, 1909, obtained the consent of both Dr. Printy and Dr. Wagner to her removal from the hospital. Through the intercession

of an old friend of Mrs. Newport, Laura Thompson was induced to go to the hospital to see Mrs. Newport, and the latter on this occasion asked Mrs. Thompson if she could not be taken to the latter's home, to which Mrs. Thompson replied that she could. Both Edward Kellan and Wernecke were frequent visitors at the hospital during Mrs. Newport's confinement there, and Wernecke protested strenuously against her removal from the hospital, and, according to the testimony of Sarah Geary, the nurse, remarked, "All I fear is, there is going to be a second will made." In the meantime Louis Kellan had arrived, and, according to the testimony of Sarah Geary, had been requested by Mrs. Newport to see an attorney and have him draw another will. After her removal to the home of Mrs. Thompson, and on June 28, 1909, another will was drawn by Helen F. Lillis, a stenographer in the office of Joshua R. H. Potts, one of the attorneys for the appellees in this case. Miss Lillis testified that about eleven o'clock on the morning of June 28 Louis Kellan entered the office and inquired for Mr. Potts; that she informed him that Mr. Potts was not in the city, and, after learning the nature of Kellan's business, informed him that she could draw the will; that he told her what disposition Mrs. Newport desired to make of her property, and that the will was prepared from the information given her by Louis Kellan. This will was executed by Mrs. Newport about seven o'clock in the evening of that day, in the presence of Miss Lillis, Sarah Geary and three attesting witnesses, while she was confined to her bed at the home of Laura Thompson, and is the instrument which is in controversy in this case. After providing for the payment of her debts, etc., the testatrix bequeathed to Henry E. Kellan, Edward L. Kellan and Ellen Newton, each, the sum of one dollar; to William Kellan and Mary Davis each the sum of $500; to Emma Hospitalier $100; to the children of Louis Oest $400; to the children of Henry Oest each the sum of one dollar, and all the remainder of her estate

to Louis H. Kellan, Arthur R. Kellan, Laura E. Thompson and Dora Clark, in equal shares. William F. Ullrich was named as executor of the will.

Mrs. Newport died July 3, 1909, leaving an estate, consisting principally of real estate, valued at approximately $10,000. The death certificate, which was signed by Dr. Printy, stated that the immediate cause of death was Graves' disease and that the contributing cause or complication was Bright's disease. From the testimony given in this case it appears that Graves' disease is a malignant form of goitre, which usually affects the mind of the person afflicted, and is also known as exophthalmic goitre. Both Dr. Wagner, who performed the operation removing the goitre, and Dr. Printy, testified that Mrs. Newport did not have Graves' disease or exophthalmic goitre but had a cystic goitre, which, according to the testimony, is of an entirely different formation and does not affect the mind of the person afflicted therewith, and that the cause of her death was Bright's disease.

The only evidence offered on behalf of appellant, other than the first will and the death certificate above mentioned, consisted of the testimony given by Dr. Stuart Johnstone, Dr. A. C. Croftan, Richard L. Wernecke and William F. Ullrich, a transcript of testimony given by certain witnesses for appellees on the former trial of the case, and a postal-card written by Louis H. Kellan to his sister, Mrs. Davis. Neither Dr. Johnstone nor Dr. Croftan had even seen Mrs. Newport. Their testimony concerning her mental condition and her capacity to make a will consisted of opinions based upon hypothetical questions propounded by counsel for appellant. Based upon the assumption contained in the hypothetical questions that Mrs. Newport had been afflicted with Bright's disease and Graves' disease for several years, and assuming various other conditions which it is unnecessary to here mention except that the immediate cause of her death was Graves' disease, Dr. Johnstone tes-

tified that in his opinion Mrs. Newport, at the time she executed the will in controversy, was of unsound mind; and Dr. Croftan gave it as his opinion that it was probable that at the time she executed the will she was under delusions, but further stated that he would not consider it absolutely impossible that a woman afflicted in the manner described in the hypothetical question could have retained her mind and memory to a sufficient extent to understand what she was doing.

R. L. Wernecke, after testifying that Mrs. Newport had suggested all the terms and provisions of the first will and that it was drawn in accordance with her directions, testified that he visited her at the hospital a number of times; that his first visit after the will was executed was four or five days after the operation; that he asked her how she felt and she said she was feeling pretty well; that seven or eight days later, when he called, she was shouting for the nurse, and informed the witness that the nurse had been gone four hours and she had nobody to wait on her; that he told her he would step out and see where Miss Geary (the nurse) was, but at that time another nurse came to take care of her and the witness left the room; that as he was leaving the hospital he met Miss Geary coming in and informed her that Mrs. Newport was claiming that she had been gone three or four hours, and that Miss Geary replied: "That old fool is crazy in the head; every time I am out two or three minutes she says I am gone three or four hours; she does not know what she is talking about." Miss Geary, when on the witness stand, denied making the statements attributed to her by this witness. Wernecke further testified that he afterwards visited Mrs. Newport at the hospital almost every day, and that "some days she was all right and then again she wasn't;" that her physical condition got worse every day; that on one occasion when he entered her room she was shrieking and wanted the witness to take her away from the hospital,—to take her anywhere,

or throw her in the lake,—that they were trying to poison her; that on several occasions she did not know the witness when he spoke to her; that on two occasions he found her mumbling and in a delirious condition; that from what he saw and heard he formed an opinion that she was not strong enough, mentally, to transact business; that he talked with Mrs. Newport just before she was removed from the hospital and asked her if she wanted to go to Mrs. Thompson's house, to which she replied that she would do anything to get away from the hospital; that he did not see Mrs. Newport again; that he went to Mrs. Thompson's house about seven o'clock on the evening of the date of the last will; that Laura Thompson met him on the sidewalk and said she could not allow him to see Mrs. Newport as she was very low and was expected to die any moment and that they had just sent for a clergyman; that he saw Mr. Thompson, Mr. Boller, Mr. Brown and a doctor going up the steps into the house, but that he (the witness) did not go in.

The substance of Ullrich's testimony was, that while he was well acquainted with Louis Kellan he did not know Mrs. Newport, and did not know that he had been named as executor of her will until the will was probated.

The transcript of testimony given on the former trial was offered for the purpose of impeaching certain of the witnesses who testified on behalf of appellees, particularly Sarah Geary. The postal-card written by Louis Kellan, which appellant offered, was not admitted in evidence. It was dated July 2 at Iron Mountain, Michigan, was addressed to Mrs. Mamie Davis at St. Marquette, Michigan, and, omitting the address, was as follows:

"Aunt very weak. Had aunt fix things somewhat Monday. Cut Ed and Ellen off for one dollar, but they don't know it. I can not go down Sunday.                                     Louis."

The evidence offered by appellees consisted of the testimony of J. M. Mershimer, a physician, and Phil J. Boller, a piano manufacturer, two of the attesting witnesses to

the will in controversy; the testimony of Dr. Printy, the physician who was in daily attendance upon Mrs. Newport from the time she became ill until her death; the testimony of Dr. Carl Wagner, the surgeon who performed the operation in which the goitre was removed, and who saw her every day while she was at the hospital and saw her again at the home of Mrs. Thompson six days before her death; the testimony of Helen F. Lillis, who drew the will; the testimony of seven old acquaintances who visited her at various times during her illness, and the testimony of a letter-carrier who delivered a registered letter to Mrs. Newport and obtained her signature to a receipt therefor after her removal to the home of Mrs. Thompson. To attempt to set out in detail the testimony of all of these witnesses would unnecessarily extend this opinion and would serve no good purpose. Helen F. Lillis testified that after she had drawn the will she took it to the home of Mrs. Thompson, where Mrs. Newport was then staying, and there, in the presence of Miss Geary, the nurse, read it to Mrs. Newport; that at the end of each clause she would stop reading until Mrs. Newport indicated her approval thereof; that after reading the entire will the witnesses were called into the room and the will was duly executed, and that in her opinion Mrs. Newport was then of sound mind and memory. This testimony is, in substance, the same as that given by Sarah Geary upon the same subject.

Neither of the two attesting witnesses who testified upon the trial of this case had ever seen Mrs. Newport prior to the execution of the will. They were requested by the husband of Laura Thompson to go to his house and witness a will. Both testified, however, that in their opinion, based upon their observations made at that time, she was of sound mind and memory when she executed the will.

Dr. Printy, Dr. Wagner and Sarah Geary, who had the best opportunity of any of the witnesses to observe Mrs. Newport's mental condition, all testified that after the op-

eration, on each occasion that they, respectively, saw her, the condition of her mind and memory was good and that such condition continued until the day before her death. Their testimony is in direct conflict with that given by Wernecke. The testimony of Sarah Geary in particular details Mrs. Newport's actions and conversations and her condition while under her care, and, if true, clearly, demonstrates that Mrs. Newport retained her usual mental powers and was perfectly rational from the time she entered the hospital until the day before her death, except the period during which she was under the effects of the anæsthetic.

A certified transcript of the testimony of the attesting witnesses to the will, given upon the hearing in the probate court to probate the will, was also offered in evidence. The testimony of Dr. Mershimer and of Boller is in substance the same as that given upon the trial of this case. The remaining witness to the will was Thomas J. Brown, a clergyman, who was not called as a witness upon the trial in the circuit court. He testified in the probate court that he first met Mrs. Newport about a week before her death; that he thereafter called on her three or four times and had a conversation with her each time, and that, based upon these conversations with her, it was his opinion that at the time she executed the will she was of sound mind and memory.

The seven friends and acquaintances of Mrs. Newport who testified on behalf of appellees were persons who had frequently seen and conversed with her during the last years of her life. Each of them had visited her at the hospital and some of them had visited her after her removal to the home of Mrs. Thompson, and it was their unanimous opinion that on the various occasions on which they saw her, both before and after the operation, she was of sound mind and memory.

The foregoing statement of the facts disclosed by the record clearly shows that the verdict of the jury was not

manifestly against the weight of the evidence, but, on the contrary, was supported by a clear preponderance.

Numerous objections are made to the rulings of the court upon the admission and exclusion of evidence. One theory advanced by appellant is, that Mrs. Newport was arbitrarily removed from the hospital by Mrs. Thompson at a time when her condition was such that she should not have been removed, and in order to support this theory appellant attempted to prove by Wernecke that he had objected to her removal and had protested to Miss Geary that the Mother Superior had said she should not be removed. It appears that Mrs. Newport was very anxious to be removed, and the attending physicians both testified that they consented to her leaving the hospital. In the light of this testimony on the part of the physicians in attendance it was immaterial whether the Mother Superior deemed it inadvisable for Mrs. Newport to be taken away at that time.

It is contended that the court erred in sustaining objections to certain questions propounded upon the cross-examination of Sarah Geary. These questions all related to an alleged conversation between Mrs. Newport and Wernecke upon his first visit to the hospital. The witness had not even referred to any such conversation upon her direct examination, and the questions propounded by the appellant were therefore not proper upon cross-examination.

It is also urged that the court erred in refusing to permit Wernecke to testify to certain statements made by Mrs. Newport in the conversation which he had with her upon his first visit to the hospital, and again, on the same day, when the first will was executed. This witness was permitted to testify that upon his first visit Mrs. Newport told him that she had sent for him in order to make the will that she had spoken to him about several months before, and then told him what she wanted in the will; that she said she wanted to divide her estate into three equal parts and give one-third to each of her brothers or their heirs

and the remaining one-third to her sister or her heirs, and that she wanted to give Edward Kellan and Mrs. Newton each $200 more than the others; that he told her he was not a lawyer and could not draw the will and advised her to employ an attorney, and that she directed him to have his attorney draw the will, which he accordingly did on the same day. Appellant then offered to prove by this witness that in this conversation Mrs. Newport said she wanted to cut Laura Thompson and Louis Kellan off with a dollar each, and that later, on the same day, when Wernecke had finished reading the first will to her, she said to him, "That is as I want it," but the court refused to permit appellant to make this proof. Such evidence could not be considered by the jury upon the question of undue influence, (*Kaenders* v. *Montague*, 180 Ill. 300; *Compher* v. *Browning*, 219 id. 429; *Waters* v. *Waters*, 222 id. 26;) and, although competent upon the issue of testamentary capacity, would have been of little probative force. (*Hurley* v. *Caldwell*, *supra*.) The evidence preponderates so strongly in favor of appellees upon the issue of testamentary capacity, and it is so highly improbable that the admission of this testimony would have changed the verdict, that we would not be warranted in reversing the decree because it was excluded.

Complaint is made of the action of the court in excluding the postal-card admitted by Louis Kellan to have been written by him. Kellan was called to the stand for the sole purpose of identifying the postal-card, and admitted its authorship. The card is offered as original evidence, and the question of the competency of Kellan to testify when thus called by an adverse party is not presented. In *Cunniff* v. *Cunniff*, 255 Ill. 407, this identical question was presented and we there held that the evidence was properly excluded. The holding in that case is criticised by appellant and we are asked to overrule it. The rule announced in the *Cunniff case* is well established and has been followed by a long line of decisions in this State. (*Marshall* v. *Ad-*

*ams,* 11 Ill. 37; *McMillan* v. *McDill,* 110 id. 47; *Campbell* v. *Campbell,* 138 id. 612; *Boyle* v. *Boyle,* 158 id. 228; *Dowie* v. *Driscoll,* 203 id. 480.) This rule is not only in conformity with the weight of authority, but is also calculated to preserve the rights of parties in such cases.

Two of the witnesses were permitted to state that they did not observe any change in the mental condition of Mrs. Newport, and when asked to compare her mental condition at one given time with that at another given time answered that it was the same. It is insisted that this was error, but we perceive no reason why witnesses for proponents should not be permitted to testify to the mental condition of the testatrix both before and after the time it is alleged by contestants that her mind became impaired, and this would necessarily result either in direct or indirect comparison.

It is claimed that the court erred in admitting the testimony of the subscribing witnesses given in the probate court, for the reason that as these witnesses testified fully on the trial the testimony was cumulative, and that the statute contemplates only the admission in evidence of the oaths of the subscribing witnesses. It appears that instead of the formal oath being made in the probate court the witnesses were sworn and testified in response to interrogatories propounded to them. The substance of this testimony was that required of attesting witnesses by the statute and it did not go beyond the requirements of the statute. Under section 7 of the Wills act, which provides that the certificate of the oath of the subscribing witnesses at the time of the first probate shall be admitted as evidence in a suit to contest a will, a certified transcript of their testimony at the probate is admissible in a will contest, notwithstanding the witnesses have already testified to the same effect. *Baker* v. *Baker,* 202 Ill. 595.

Seventeen instructions were given on behalf of proponents, and objections are urged to practically all of them. By the first instruction the jury were told that the burden

was upon the proponents to make out a *prima facie* case of the execution of the will and of testamentary capacity, and that the burden shifts if two witnesses to the will appear and testify to its execution and to the soundness of mind of the testator. The instruction further stated that if two witnesses so appear and testify, and if it be proved that Mary E. Newport was able to transact and understand her ordinary business matters after the surgical operation, then the jury are to presume that she retained sufficient testamentary capacity to execute a valid will until it is shown, by a preponderance of the evidence, that she had lost such capacity. The principal complaint in regard to° this instruction is, that the jury were told that if Mrs. Newport was able to transact and understand ordinary business matters she had sufficient capacity to make a will. In this respect the instruction was more favorable to appellant than to proponents, as a person may not be capable of transacting ordinary business and yet have testamentary capacity. *Hurley* v. *Caldwell, supra.*

By the thirteenth instruction the jury were told that the claims of the attending doctors and nurse could in no way be affected by the outcome of the suit. It seems that the nurse and the two attending physicians each had presented claims against the estate of Mrs. Newport which had been allowed, and the contention is that by reason thereof they were interested, the theory being that the executor and those interested in the will of June 28 were more favorably disposed toward these claimants than those interested in the former will. The claims of these physicians and the nurse could not be affected by the outcome of this litigation. Where an executor has acted in good faith under a will which is afterwards set aside, his acts are valid and will be sustained. (*Smith* v. *Smith*, 168 Ill. 488.) Such acts of an executor are subject to the approval of the court, and when they have been performed in good faith are binding upon the estate.

By instruction No. 16 the jury were instructed that because Mary E. Newport was taken to the home of one of the beneficiaries they were not to presume that undue influence was exercised but that the exercise of such influence must be proven by a preponderance of the evidence. This instruction was a proper one, as the burden of proving the allegation of undue influence rested on the party making it.

Instruction No. 17 is almost a literal copy of instruction No. 3 approved in *Taylor* v. *Pegram,* 151 Ill. 106, with the words "with reasonable certainty," which were objected to in that case, omitted therefrom.

We have carefully examined all the other given instructions to which objections have been made and find them substantially correct and free from error.

Objection is also made to the refusal of the court to give four instructions asked on behalf of appellant. Refused instruction "F" directed the jury that if they found that the will was procured to be drawn by Louis Kellan, such circumstance required proof that Mrs. Newport was not imposed upon in making the will. This instruction, if given, would have shifted the burden of proof on the question of undue influence from the contestants to the proponents of the will, and was properly refused. The material and proper portions of the other refused instructions were given in other instructions of the series, and the court did not err in refusing to give them. The jury were fairly and fully instructed on the law as to each issue involved.

From a careful consideration of the whole record we are of the opinion that the decree of the circuit court was proper, and the same is accordingly affirmed.

*Decree affirmed.*