MARY E. CARNAHAN, Appellee, *vs.* NATHAN HAMILTON, Exr., Appellant.

*Opinion filed December 16, 1914.*

1. WILLS—*when the Supreme Court will review the evidence although no peremptory instruction was asked.* In a will contest case brought directly to the Supreme Court the evidence will be reviewed regardless of whether a peremptory instruction was requested in the trial court, and the judgment will be reversed if in the judgment of the Supreme Court the judgment and verdict are clearly against the weight of the evidence. (*Dowie* v. *Sutton,* 227 Ill. 183, explained.)

2. SAME—*what does not show that testator lacked testamentary capacity on the day he made his will.* Testimony by a physician who treated the testator, two days after the will was made, for an abscess above the nose, to the effect that the testator was suffering intensely and that the witness did not think he was in a condition to transact ordinary business, and that he judged from what he saw and what the testator said to him that such condition had lasted several days, does not necessarily show that the testator lacked testamentary capacity when the will was made.

3. SAME—*mere infirmity and old age do not necessarily show want of testamentary capacity.* To sustain a charge of want of testamentary capacity something more must be shown than mere infirmity or old age on the part of the testator.

4. SAME—*unreasonable prejudice against relatives is not ordinarily ground for setting aside will.* An unreasonable prejudice against relatives is not ordinarily ground for setting aside a will, unless it can be explained upon no other ground than that of an insane delusion.

5. SAME—*unequal division of testator's property does not show want of testamentary capacity.* An unequal division of the testator's property among his heirs does not, of itself, justify holding that he did not possess testamentary capacity.

6. SAME—*fact that testator believed in a dream about hidden treasure does not invalidate will.* The fact that the testator related a dream he had had about hidden treasure and said he believed he would find it is not ground for holding his will invalid, where such fact in no way appears to have influenced him in making the will.

7. SAME—*what does not show want of testamentary capacity.* The facts that the testator shed tears when conversing about his

deceased daughter and grew excited at times when talking about business affairs do not show that he lacked testamentary capacity.

8. SAME—*effect of proof that testator had hardening of the arteries.* In determining the effect of proof that the testator, an old man, had hardening of the arteries, the question is not what the tendency of such disease is, but what the effect of such disease was in the particular case.

9. SAME—*person capable of transacting ordinary business has testamentary capacity.* A person who is capable of transacting ordinary business is capable of making a valid will.

10. SAME—*a witness may state that he observed no change in mental condition of testator.* A witness who was present when the will was made may state that he observed no change in the testator's mental condition then from other times he had seen him.

11. SAME—*when an instruction as to knowing the extent of property is improper.* An instruction requiring, as a condition of possessing testamentary capacity, that the testator know, "without prompting," the nature and extent of his property is improper, particularly where there is no evidence that he was prompted by anyone when he was making the will.

12. SAME—*when instruction as to justice of will is misleading.* An instruction concerning the right of the testator to leave but a small amount of property to his only direct heir is misleading, where its tendency is to cause the jury to believe they had a right to decide whether the will was just or unjust as to the various relatives and give their verdict accordingly.

APPEAL. from the Circuit Court of Shelby county; the Hon. THOMAS M. JETT, Judge, presiding.

WHITAKER, WARD & PUGH, and STEIDLEY & CROCKETT, for appellant.

WILLIAM H. RAGAN, and GEORGE B. RHOADS, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed by appellee, Mary E. Carnahan, to contest the will of her grandfather, Payton A. Bond, of whom she was the only heir-at-law. After an answer and replication were filed an issue of fact was submitted to the

jury as to whether the instrument in question was the last will and testament of Payton A. Bond, deceased. The jury found in the negative. A motion for new trial was overruled and a decree entered in accordance with the verdict. Thereupon this appeal was prayed.

The will was executed on April 4, 1910, at which time Bond was seventy-two years of age. He lived until May, 1913. His wife died some fifteen years previous and he never afterward re-married. At the time of his wife's death they had one child living, Julia Ann. After his wife died Bond lived on his farm in Shelby county with said daughter, Julia Ann, and her husband, William Carnahan, until her death, January 25, 1910. She left surviving two children, one of whom was appellee, then fifteen months old, and the other a baby just born and who died within a few days after its mother. At the time of making the will Bond had three sisters living and one sister deceased, who left surviving her several children and descendants of deceased children. Very shortly after the will was executed Bond took a trip to Oklahoma, where he visited relatives. After his return he lived with one of his sisters in the city of Pana, Christian county, Illinois, until the time of his death. At the time the will was made he owned 160 acres of land in Shelby county, upon which he and his son-in-law were then residing, besides some personal property. Some time thereafter he purchased a house and lot in Pana, which he continued to own until the time of his death. By his will he gave his grand-daughter, appellee herein, $100 and all his household goods and effects. To his sisters then living, and to the heirs of the deceased sister, he gave the 160-acre farm, the will further providing that all other personal property, goods and chattels should go to the heirs theretofore mentioned. The will contained no residuary clause as to real estate, and consequently the house and lot that he afterward acquired in the city of Pana would descend to his granddaughter, appellee herein.

The bill averred that Payton A. Bond, the testator, was of unsound mind and memory at the time of the execution of the will; that at that time he was suffering from insane delusions and therefore did not possess testamentary capacity. Upon the trial of the case appellant produced forty witnesses who testified they were acquainted with the testator, and that in their opinion he was capable of transacting ordinary business affairs and understood the nature of his property and the natural objects of his bounty, relating various conversations they had had with him during the last few years of his life. Among this number were old acquaintances and neighbors,—farmers, physicians and bankers,— most of them having known him all the way from ten to fifty years, and many testified their acquaintance had been of an intimate nature. On behalf of appellee thirteen witnesses were introduced, the majority of them relatives of her father. Most of these thirteen witnesses testified they had seen and talked with Bond near the time he executed the will, and that at that time they did not think he was of sound mind and memory or had sufficient mental capacity to transact ordinary business, or was able mentally to understand the extent of his property or who his relatives were. It is apparent, however, from the testimony of at least one or two of these witnesses, that they were not certain on this point. The allegations of the bill admit, and it is conceded in the briefs of appellee, that subsequent to the execution of the will the testator took care of and transacted his business. The theory of counsel for appellee is that mental incapacity existed at the time of the execution of the will by reason of delusions, jealousy and sickness, from which he subsequently recovered though he never fully regained his ordinary health.

Appellant contends that the verdict is manifestly against the great weight of the evidence. Appellee contends that this question cannot be raised in this court as no motion was made at the close of all of the evidence asking for a

peremptory instruction, citing in support of this contention *Dowie* v. *Sutton,* 227 Ill. 183. That case was brought to this court by way of the Appellate Court. What was there said about the failure to give a peremptory instruction being a waiver of the question as to whether there was sufficient evidence to support the verdict has no bearing on a case like this, brought here directly from the trial court. In that case the court cited *Long* v. *Long,* 107 Ill. 210, where it was said the rule is well settled by the previous decisions of this court that in will contests like the present "the finding of the jury is conclusive unless clearly against the weight of evidence, [citing authorities,] and in this respect they are put upon the same footing with cases at law. Such being the case, it would seem to follow—and we so hold—the finding of the Appellate Court in conformity with the verdict of the jury is conclusive upon all questions of fact. Ordinarily the finding of the facts by the Appellate Court, in a chancery proceeding, is not conclusive on this court, but this class of cases, under the construction given to our statute, does not fall within the general rule, but such cases are treated in this respect, as we have already seen, as actions at law." This case was properly brought directly to this court because a freehold was involved. In all cases of this kind thus brought here this court has always reviewed the evidence regardless of whether a peremptory instruction was asked of the trial court, and has reversed such cases when in the judgment of the court the verdict of the jury was clearly and manifestly against the weight of the testimony.

The physician who attended the testator at the time of his death had known him for about ten years and testified that he had hardening of the arteries, and that this condition, in the three or four years before his death, had gradually grown worse; that he had poor circulation, generally, but mostly complained of pain in his feet; that his death was caused by gangrene, beginning in one of his feet, which condition was superinduced by hardening of the arteries;

that a man of the age of the testator at that time who has been active in his life is more or less troubled with hardening of the arteries. We judge from the record that the testator had been in fair health most of his life. There is evidence tending to show that he had an attack of *la grippe* in December, 1909, and remained in bed until near the middle of February; that he was troubled at the same time with piles and fistula; that on this account he was unable to attend either the funeral of his daughter on January 25, 1910, or that of the new-born child four days later. We think the weight of the evidence shows that he was up and around during the month of March that year, going on business or otherwise to Pana, Assumption and other near-by places. There is some evidence on the part of appellee that during this time he complained that his head troubled him. Two days after the will was drawn Dr. Martin, who had treated him in the preceding January for the "grip," testified he was called from Tower Hill to treat him; that on April 6 in question he found him in bed with a high temperature and apparently suffering intensely, and that the cause was an abscess just over the nose, in the forehead; that he saw him later, on April 25, and the abscess had broken and he was practically recovered. He testified, also, that he noticed that the testator's arteries were hardening, and other conditions arising from old age. This is substantially all the testimony in the record bearing on the testator's physical condition during the last three or four years of his life. So far as the record discloses he was in fair health, considering his age, after April, 1910, until his final sickness, which lasted only a few days.

In the forenoon of April 4, 1910, testator left his farm, where he was residing with his son-in-law, William Carnahan, and walked to the home of a neighbor, Joseph Kelly, living about three miles and a half away, where he had the will in question drawn by Kelly. Charles Simmons, another neighbor, who lived about a mile south of the Bond home,

testified that he had met the testator going to Kelly's, and the two, having been acquainted for years and having often transacted business together, stopped and had quite a visit; that during the conversation Bond asked Simmons if he had seen Kelly pass there that morning, stating that he was going to Kelly's to have his will made; that he was going to take a trip out west and might meet with an accident or might get sick, and he wanted his business matters fixed up before he went away. Simmons further stated that after they parted testator went on toward Kelly's home. Joseph Kelly, who drafted the instrument here in question, died in May thereafter. His wife testified that the testator came to their house the morning of April 4 and talked with her husband about making his will. The witness had known testator all his life and talked with him on that day. Her husband and testator sat down at a table to write the will, Mrs. Kelly leaving the room. After the will was written, some time that afternoon, Bond left to get someone to witness it, and came back with Isaac Lockwood and George W. Simpson, who signed as witnesses. Mrs. Kelly further testified that in her conversation with testator he spoke of his sisters and said they were always good to him and that he wanted to leave something to them, and also spoke of his grand-daughter (appellee herein) in a friendly way; that he said nothing while he was there to indicate that he was angry with any of his relatives. Lockwood and Simpson were plowing in a field about a quarter of a mile from Kelly's house when the testator asked them to witness his will. They consented and walked with him to Kelly's, where the will was signed and witnessed. They talked with him in a general way from the field to the house, and both testified that he showed no anger at the time the will was signed or at any time that day when they saw him. Both of these witnesses had known him for years. Mr. and Mrs. Kelly, Lockwood and Simpson were the only ones present with testator in the house at the time the will was signed and wit-

nessed. The three that were living all testified that they believed him to be of sound mind and memory at that time, and that he was able to transact the ordinary business affairs of life and understood what property he owned, who were his heirs and the natural objects of his bounty. Charles Simmons testified that testator on that or the next evening came to his house and drank a cup of coffee at the supper table, remaining there, visiting, some twenty or thirty minutes. Simmons and Simpson saw him frequently between the time the will was drawn and the date of his death, and both testified that they thought he had testamentary capacity at all of their interviews. Many farmers who lived near Bond, and a number of merchants and business men who had known him and met him before, about the time and after the will was drawn, all testified substantially to the same effect,—that in their judgment he was a man of sound and disposing mind and memory. The physician who attended him during his last illness testified that in his judgment Bond's mental condition was such in 1910, and until his death, that he was able to transact ordinary business affairs, understand what property he owned and who were his relatives. He stated on cross-examination that a person having hardening of the arteries was sometimes affected thereby so that he might be predisposed to irrational likes and dislikes. There was, however, nothing in the testimony of this witness that indicated that he was of the opinion that the testator was predisposed in this way. Dr. Martin, to whose testimony we have heretofore referred with reference to treatment for an abscess on April 6, 1910, stated on direct examination for appellant that in his judgment, in the years 1909, 1910 and 1911, testator was competent to transact the ordinary affairs of life and understood the extent of his property, who were his heirs and the natural objects of his bounty. He stated on cross-examination that on April 6, 1910, when he treated testator for this abscess, he did not think testator was in condition to transact ordinary

business, and that from what the testator said to him then and what he saw, the condition he found him in was one that in his opinion had existed for several days. We do not understand this witness' testimony as stating, as contended by counsel for appellee, that he (the doctor) thought testator lacked testamentary capacity at that time, but only that he was in such pain then that witness would not say he was in a condition to transact ordinary business.

There was nothing in the testimony of any of the forty witnesses who testified for the appellant, except that of Dr. Martin, to which we have just referred, that could in any way be construed as indicating that the testator was not of sound and disposing mind and memory at or about the time the will was executed or at any other time, or that there was anything in his actions or talk that in the slightest degree indicated that he was possessed of an insane delusion or harbored an unreasonable jealousy against any of his relatives or friends. It would serve no useful purpose to set out in detail the testimony of all these forty witnesses. They are all in substantial accord upon the issue here involved.

Mrs. Alta Rowley, who was a niece of William Carnahan, appellee's father, lived in testator's family from the time of his daughter's death, in January, 1910, until June after the will was executed. She was at that time seventeen years of age and unmarried. She testified that she thought testator was not of sound mind from February to June of that year; that she did not mean that he was of unsound mind at all times, but that he had spells, and when he had these spells he was not of sound mind; that usually he talked naturally, just as anyone else would, but would get worked up and nervous at times. The witness further testified that while she worked there Bond proposed marriage to her; that she advised him to get someone older than she was, and he replied she was his choice; that he would only live a few years, and if she married him she would have a

home after he was gone and could take someone younger; that he never talked to her about marriage but this once; that she overheard him ask Mrs. Halbrook, who was then living there, to marry him.

Mrs. Mary Halbrook (now Mrs. Carnahan, the wife of appellee's father,) testified that from February 20 to April 4, 1910, testator was not of sound mind and memory, did not understand what property he owned or its value or who his relatives were; that she had known the testator as long as she was old enough to remember, and that she was keeping house for him and Carnahan, with the assistance of the witness last referred to, after Mrs. Carnahan's death until she married Carnahan, in June of that year. She testified that the testator proposed marriage to her in March, 1910; that during that conversation he asked her if she would drop one of her admirers and marry him; that if she would do that she would have a home the rest of her days. She testified that during that or another conversation on the subject he asked her whether she was engaged to Oscar Pope or William Carnahan, saying it was all right if she was going to marry the former but he did not want her to marry Carnahan; that he stated that if she did not marry him he would change his will and go out west; that when she refused him he became sullen and remained in that condition for several days; that during these talks about marriage he would sometimes cry and seem quite excited; that the last conversation he had with her about this matter was April 4, 1910; that she did not see him again until late that evening. Mrs. Carnahan further testified that when Bond came home after the will was drawn he was taken sick in the night, and the next morning Dr. Martin was called and treated him for the abscess heretofore referred to. The witness further stated that during her conversations with the testator he had talked about some money he said his father had buried on the old home place by a stump, and that he had dug for this money and believed he would be able to find it. The witness fur-

ther testified that she had been married three times and that she had been divorced from her second husband; that shortly before the testator had proposed to her she had been engaged to Oscar Pope, but had broken that engagement prior to her talks with the testator.

William Carnahan, the father of appellee, testified that he believed that when the testator left home on the morning of April 4, 1910, he knew what he was talking about and had sense enough to know who his relatives were and what property he owned. He testified that after the testator's daughter's death he (the witness) told Bond he did not know what he was going to do with appellee; that he did not see how he could take care of her and keep the home; that he had about decided to put her in an orphanage; that testator broke down and cried and said to the witness to get somebody to come and keep house; that he did not want the child taken away; that it was not right to take her to a strange place; that because of this they got Mrs. Halbrook and Alta Hoover (now Mrs. Rowley) to keep house for them and look after the little girl; that he (the witness) had a sale of some personal property on testator's farm in March, 1910, and that the testator on the day of the sale began piling up some chairs and a patent churn and washing machine and articles of furniture that he owned and said he was going to sell them at the sale; that he looked at the witness with a glare in his eyes when talking about the subject; that he finally decided not to sell the goods and said he would leave them to Mary, the appellee; that testator was a peculiar man, with a very high temper at times, and that he would get mad and go all to pieces, and you could not reason with him during these mad spells; that during the spring of 1910 testator had a row with him about the way he was plowing the garden. The testimony in the record tends to show that William Carnahan had trouble at one time with his wife, testator's daughter, and that they

were separated, but that several years before her death they began living together again.

George Kelly, the brother of the man who drew the instrument in question, testified that he met the testator on the morning of April 4 at the cross-roads near his brother's place and that they had quite a long talk; that the testator talked about his proposal to Mary Halbrook; that he told Kelly of a dream he had of money in a glass jar buried by an old stump; that during the conversation testator cried and wrung his hands and waved his arms to such an extent as to scare a team of horses that approached, driven by a lady, so that they wheeled around and started in the other direction and witness was compelled to help her get them under control again. The witness was not asked, and did not state, just what he did with his own horse and buggy during these proceedings. This witness testified he did not think the testator was of sound mind. He is a brother-in-law of appellee's father.

The wife of George Kelly, sister of William Carnahan, also testified that she did not think the testator was of sound mind at the time the will was executed; that she saw him at her house on April 5, 1910, and that the way he talked then she did not know whether he had mental power to know what property he owned or not; that he told her on that day that he had fixed it so that the appellee would get everything.

Mr. and Mrs. George Morgan testified that they lived near the home of testator; that on, or a day or two before, the fourth of April (they could not fix the date with certainty) the testator visited them at their home and was complaining bitterly of William Carnahan; that he was also complaining of his forehead. Mrs. Morgan testified that what he said did not sound sensible, and that it sounded "like a man that was insane." Her reason for this belief was, apparently, that he stated he was not going to stay any longer on his farm because Carnahan did not want him

around, and that she thought this sounded like an insane man. Both she and her husband testified that he said he had had trouble with Carnahan about plowing the garden, and other things. Both of them stated that they did not think he was of sound mind on the day in question.

Some of the witnesses for the appellee testified to additional details as to what they alleged were the testator's peculiarities about the time the will was executed. Two of them stated they heard him talking aloud to himself about his property when confined to his bed with. *la grippe,* the winter previous to the execution of the will. Others testified as to his worrying over business affairs on the ground that some money he had loaned was not paid according to agreement, and that he expressed a fear he would not have enough to live on in his old age. Several witnesses also stated that the testator told them he was worrying as to the future life of his daughter, until he found something, by studying the Bible, with reference to a woman dying in childbirth that greatly relieved him.

We have set out, in the main, the substantial facts relied on by counsel for appellee to show the mental incapacity of the testator. It is urged that he was possessed of insane. delusions. The principal grounds relied on to support this argument were his proposal of marriage to the two women, Mrs. Halbrook and Miss Hoover, his alleged unreasonable prejudice toward his son-in-law, William Carnahan, and his extreme excitability when talking about his daughter's death and other matters of great interest to him.

Infirmity 'from old age does not render a person incapable of making a will, unless such infirmity has so far impaired the testator's mind that he is incapable of understanding his business at the time he is engaged in making the will. (*Schmidt* v. *Schmidt,* 201 Ill. 191.) To sustain an allegation of want of testamentary capacity something more must be shown than mere physical disease and old age on the part of the testator. (*Woodman* v. *Illinois Trust*

*and Savings Bank,* 211 Ill. 578, and cases cited; *Waters* v. *Waters,* 222 id. 26.) An insane delusion which will render one incapable of making a will is difficult to define. This court has said that it is a belief in a state or condition of things in the existence of which no rational person would believe. (*Schneider* v. *Manning,* 121 Ill. 376; *Snell* v. *Weldon,* 243 id. 496.) Again, it has been stated that an insane delusion is a belief in something impossible in the nature of things, or impossible under the circumstances surrounding the individual, which refuses to yield either to evidence or reason. (*Scott* v. *Scott,* 212 Ill. 597; *Drum* v. *Capps,* 240 id. 524; *Louby* v. *Key,* 258 id. 558.) Prejudice of the testator against a relative is not ground for setting aside a will unless it can be explained upon no other ground than that of an insane delusion. A person may be prejudiced against some of his children or persons who are the natural objects of his bounty and make unfair remarks about them without having a proper foundation for his conduct, but it does not necessarily follow that he is without testamentary capacity. Unreasonable prejudice against relatives is not ordinarily ground for invalidating a will. That can only be done when the testator's aversion is shown to be the result of an insane delusion, his conduct not being able to be explained on any other ground. (*Nicewander* v. *Nicewander,* 151 Ill. 156; *Schmidt* v. *Schmidt, supra; Scott* v. *Scott, supra; Snell* v. *Weldon,* 239 Ill. 279; *Drum* v. *Capps, supra.*) An unequal division of testator's property among his heirs does not, of itself, justify the court in holding that testator did not possess testamentary capacity. The testator has the undoubted right to dispose of his property as he thinks best, and the fact that it is unequally divided among those who have claims on his bounty does not impair the validity of the will. It is only a circumstance which the jury may consider, in connection with other evidence, in passing upon the soundness of mind of the testator. (*Cunniff* v. *Cunniff,* 255 Ill. 407; *Schmidt* v. *Schmidt,*

*supra.*)   It cannot be presumed that the testator is insane merely because his father was insane.   Until the disease manifests its presence we cannot infer its existence in the mind of the person in question.   (*Snow* v. *Benton,* 28 Ill. 306.)   The fact that a person believes in witchcraft, clairvoyance, spiritual influences, presentiments of the occurrences of future events, dreams, mind-reading, and the like, does not necessarily affect the validity of his will.   Manifestly, a man's belief cannot be made a test of sanity.   When we leave the domain of experience or knowledge and enter upon the field of belief the range is limitless, extending from the highest degree of rationality to the wildest dreams of superstition.   What to one man may be a reasonable belief is to another wholly unreasonable.   While, under certain circumstances, belief in what men generally understand to be supernatural may tend to prove insanity, it is well known that some of the brightest and clearest intellects have honestly believed in spiritualism and other apparently supernatural influences.   (*Whipple* v. *Eddy,* 161 Ill. 114, and cases cited.)   It is the settled law that testamentary capacity cannot be determined, alone, by what one believes, nor by the character of the tales he tells concerning hidden treasure, spirits, spooks and supernatural things.   Where the acts of the testator in the conduct of his business affairs and in his ordinary life are uniformly intelligent, rational and reasonable, proof that he has related stories concerning hidden treasures that in no way appear to have influenced him in the execution of his will does not prove testamentary incapacity.   (*Wait* v. *Westfall,* 68 N. E. Rep. [Ind.] 271; *Middleditch* v. *Williams,* 4 L. R. A. [N. J.] 738.)   The fact that the testator shed tears when conversing about his daughter or grew excited when talking about business affairs that were troubling him does not, in itself, prove that he lacked testamentary capacity at the time he executed the will.   Whether hardening of the arteries has affected the mind is not a question of what the tendency of that disease

is, but the proof must be as to its effect in the particular case. (*Brainard* v. *Brainard,* 259 Ill. 613; *Drum* v. *Capps, supra.*) It is difficult to adopt any absolute or fixed rule as to what will constitute insanity in all cases. Temperament, nervous force and physical organization differ in infinite degree, and these may all have a direct or remote influence upon the intellect. While each case must depend in some measure upon its special facts, it is the settled law that a person who is capable of transacting ordinary business is capable of making a valid will; that is, if he is capable of acting in all ordinary affairs he possesses testamentary capacity. The derangement, to incapacitate the person from making a valid will, must be of that character which renders him incapable of understanding the effect and consequences of his act. It must be a want of capacity which prevents him from reasoning correctly and from understanding the relation of cause and effect in ordinary business matters. (*Meeker* v. *Meeker,* 75 Ill. 260.) That an old man in the condition of the testator, after his daughter's death should want a home and would be looking for a wife and companion certainly cannot, under the circumstances shown in this record, be very strong proof of unsoundness of mind. Such a desire is usually recognized as strong proof of a sane mind. If his home life with his son-in-law was not pleasant,—and the evidence tends strongly to show it was not,—it would be most natural that he should be thinking of how he could bring about proper home surroundings for himself. On this point, however, the character of the evidence tending to prove this desire on the testator's part may well be subject to close scrutiny. All who testified to this fact, with one exception, were relatives of William Carnahan. One of them was his present wife, whose experiences in matrimony, as shown by her own evidence, are certainly not such as to justify any strong reliance upon her statement that such an offer of marriage was proof of an unsound mind.

Counsel for appellee contend that the record shows conclusively that there was no ground for the testator having a dislike for his son-in-law, William Carnahan. A number of the witnesses testified that the testator had said to them that he always got along well with Carnahan and had been treated right by him. Other witnesses, however, some of whom testified for appellee, said positively that the testator claimed that he had trouble with Carnahan. Manifestly, the conditions were such that he did not care to live at his old home, on his own farm, after his daughter's death.

If it be admitted that Dr. Martin is correct as to the date (April 6, 1910,) when he treated the testator for the abscess above his nose, it is most improbable from the evidence in the record that this abscess was causing him severe pain or making him trouble in marked degree on April 4, the day the will was executed. No person testifying for appellee testified that he did or said anything on that day that indicated that he was suffering physically. If the witness George Kelly is correct as to the time when he met the testator on the road to his brother's, and if his testimony is conceded to be correct as to the talk and actions of Bond at that time, it by no means follows that this proves that the testator lacked testamentary capacity on the day in question. The testimony of all the witnesses in the record proves conclusively that for some time before the execution of the will the testator had been up and around and attending to his business affairs; that he was physically able to walk miles by himself; that the son-in-law did not seem to think it was at all improper for the testator to leave home at any time he desired; that he went alone, on foot, to Joseph Kelly's house on the day in question, and the four witnesses who were present on that day at that house and talked with him saw or heard nothing that indicated in the slightest degree that he was not as mentally sound and vigorous as would be expected of any man of his age. The evidence also shows conclusively that although he did not

return to his home until the next evening, or later, the son-in-law or his present wife did not think such actions on testator's part were at all out of the way. Furthermore, there is not a scintilla of testimony offered by any witness that after April, 1910, the testator did or said anything that indicated that he was not of sound mind or memory. It is conceded by counsel for appellee that there is no evidence of that character. The witnesses who testified for appellant as to the testamentary capacity of testator were most of them fully as well qualified by long acquaintance with him, and in every other way, to judge of his mental capacity as any of the witnesses for appellee. The great majority of witnesses for appellant were not interested in any manner in this litigation. The same cannot be said as to the majority of the witnesses who testified for appellee. On this record we can reach no other conclusion than that the great weight of the testimony is against the verdict of the jury on the question of the testator's testamentary capacity.

The attesting witness Simpson was asked the question what Bond's appearance was on the day that he signed the will. The witness replied that "he was just that day as he was any other day that I ever saw him." This answer was stricken out by the trial court on motion of counsel for appellee, as was another answer of the same witness that he did not observe any change in testator, and the same ruling was made as to a question asked of the other subscribing witness. The trial court's ruling on this question is in conflict with the rule laid down by this court in *Kellan* v. *Kellan,* 258 Ill. 256, where we said that it was proper for the witnesses to state that they had not observed any change in the mental condition of the testator; that as witnesses can testify as to the mental condition of the testator before and after the time the will was executed, this would necessarily result in a direct or indirect comparison.

Counsel for appellant insist that the court erred in giving various instructions for appellee. Among others, they

urge that instruction 5 so given was incorrect. That instruction states that the testator, at the time he executed the will, in order to possess the sound mind and memory required by law, must have had "the strength and clearness of mind sufficient to know in general, *without prompting,* the nature and extent of his property, the persons who were the natural objects of his bounty and their relation to him and natural claims upon him, and he must know and understand what he is doing and be able to keep things in his mind long enough to form a rational judgment in regard to them." In view of the nature of the evidence in this record we think this instruction was wrong in using the term "without prompting." There is not the slightest evidence in the record that he required or had any prompting at the time the will was executed. On the contrary, all the evidence as to what he said and did at the time the will was executed showed that he was not prompted in any way. Furthermore, this court has never laid down the rule of law that it was essential that testator should have sufficient strength of mind to know what property he owned "without prompting." So far as we are advised such a rule has never been laid down by any authority. Nothing was said by this court in *Piper* v. *Andricks,* 209 Ill. 564, that should be construed as holding to the contrary.

Appellee's instruction 10 is also criticised. It stated that the jury were instructed "that while, as a matter of law, Payton A. Bond, if he at the time was of sound mind and memory, had a right to cut off his grandchild, Mary E. Carnahan, (who, had he died without a will, would have inherited all of his property,) with but $100, and had a right to give the rest of his property to persons who would not have been his heirs-at-law had he died without making a will, yet if, in fact, at the time he made said will he did not possess the sound mind and memory required by law, then he had no right to cut her off with this $100 and give his property to persons not his heirs." This instruction is er-

roneous in assuming that he gave his grand-daughter only $100. The will showed that he gave her also the personal property that he owned at the time of his death. Counsel for appellee argue that the testimony shows that this personal property amounted to very little. The record is not at all clear as to its value. But there is a more serious objection to the instruction. The tendency of an instruction so worded would be to cause the jury to think they had a right to decide whether the will was just or unjust as to the various relatives. This court has frequently said in contests concerning wills, where the testator has made, or seemingly made, an unequal or inequitable distribution of his property among those related to him, that there is a disposition in the minds of most men to seek to hold the will invalid; that such an inclination has been found to exist in the minds of most jurors to such an extent that it cannot be controlled by instructions; that while the law is that the testator may make such disposition of his property as he sees fit and may bestow his bounty where he wishes, "the common mind is disinclined to recognize it, and jurors will too frequently seize upon any pretext for finding a verdict in accordance with what they regard as natural justice." (*Nieman* v. *Schnitker,* 181 Ill. 400, and cases cited.) The jury has nothing to do with the equity or inequity of the will. (*Rutherford* v. *Morris,* 77 Ill. 397.) Appellee had no property rights in testator's property and therefore could not be deprived or "cut off" from them. Instructions similar to this were held error in *Brainard* v. *Brainard, supra,* and *Rowcliffe* v. *Belson,* 261 Ill. 566.

Instruction 8 given for appellee was also erroneous in telling the jury that if the testator "at times had attacks of mental derangement, anger and jealousy, which, while the attacks were upon him, rendered him, during their continuance, of unsound mind and memory," and if they believed, from the evidence, that at the time he executed the purported will he was suffering from one of these attacks, they

should find the will not valid. There is no evidence that at the time he executed the will at the house of Joseph Kelly he was moved by anger or jealousy or was suffering from one of these attacks.

Counsel for appellant argue that several other instructions given for appellee were erroneous. While they may be subject to criticism in some particulars along the same lines as the instructions already referred to, we do not deem them so misleading as to require consideration at our hands.

What has already been said, together with what is laid down in the cases cited in this opinion, indicates clearly the general rules of law that should govern in the trial of a case of this character. To discuss in detail all of these various questions raised would be to unduly extend this opinion, already too long.

The decree of the circuit court must be reversed and the cause remanded to the circuit court for further proceedings not in conflict with the views herein expressed.

*Reversed and remanded.*