(No. 19347.—)
CARL R. FORBERG et al. Appellees, vs. CHARLES MAURER,
Exr. et al. Appellants.

*Opinion filed October 19, 1929.*

WARNOCK, WILLIAMSON & BURROUGHS, (DONALD B.
WARNOCK, of counsel,) for appellants.

GEERS & GEERS, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

This appeal is from a decree of the circuit court of Madison county in a suit to contest the will of Anna Cook, setting aside the probate. Mrs. Cook died on July 14, 1927, leaving no husband or descendant, her heirs, twenty-nine in number, being nephews and nieces, grand-nephews and grand-nieces. She had one brother and two sisters, all of whom died before her. Her will was admitted to probate on August 23, 1927, and on December 2, 1927, twenty-eight of the twenty-nine heirs filed a bill to contest its validity, alleging that at the time of executing it she was not of sound mind and memory but was in her dotage, suffering from insane delusions, and her mind and memory were so impaired as to render her wholly incapable of making any just and proper distribution of her estate. The bill further charged that Charles Maurer, Herman Metz and Irwin Maurer used and exercised many undue arts and fraudulent practices and resorted to falsehoods and misrepresentations to induce her to execute the instrument. The heir who did not join in the bill was a minor, who was made a defendant. The cause was submitted to a jury, which, after a trial lasting a week, returned a verdict finding that the writing was not the will of Anna Cook. At the close of the evidence the solicitors of the contestants stated in open court that they abandoned the charge of fraud and undue influence, it was ordered stricken from the bill, and the jury was instructed to disregard it in considering the case.

The sole issue at the trial was, therefore, whether the testatrix, at the time of executing the written instrument offered for probate as her will, was of sound and disposing mind and memory. The test whether she was of sound and disposing mind and memory,—that is, had testamentary capacity at the time of executing the instrument,—is, Did she have sufficient mind and memory to enable her to understand the particular business in which she was engaged?

If she was able to remember who were the natural objects of her bounty, recall to mind her property and make a disposition of it understandingly according to some purpose or plan formed in her mind, she was possessed of testamentary capacity. This is the standard which has been approved by many decisions, some of which are *Craig* v. *Southard,* 148 Ill. 37, *Bradley* v. *Palmer,* 193 id. 15, *Austin* v. *Austin,* 260 id. 299, *Williams* v. *Ragland,* 307 id. 386, and *Bailey* v. *Oberlander,* 329 id. 568.

Mrs. Cook was eighty-two years old at her death. She had been a widow over thirty years, her husband, Ed Cook, having died in 1896. He left an estate consisting of a farm of 160 acres, on which he had resided with his wife, and personal property, but no descendant. His heirs were his wife and one sister, and in the distribution of his estate his widow received the 80 acres on which was the residence, and about $12,000. She continued to reside upon this 80 acres until her death, and during this time added to it another 40 acres and acquired another farm of 141½ acres. This farm was worth at her death $18,000, while the home farm was worth $15,000. She also owned at her death block 12 in Cohn's addition to Collinsville, worth $7000, four other lots in Collinsville worth $4500, eighty-three shares of stock in the State Bank of Collinsville worth $16,102, other stocks worth $1145, time certificates of deposit $7310, Liberty bonds $7900 and good promissory notes $8923, making the total value of her estate $85,880.

The will, after providing for the payment of the testatrix's debts and funeral expenses, bequeathed to her nephew Carl R. Forberg all her mining stock, mining interests and mining rights and claims in Colorado, and also devised to him the home farm of 120 acres for life, directing that within one year after his death, or after his youngest child should attain the age of twenty years, whichever happened last, the land should be sold by the executor of

the will and the proceeds distributed to such of the children of Forberg as might be living at the time of the sale and among the descendants of any deceased child, the descendants of a deceased child to take the portion the child would take if living. The will then bequeathed $600 to each of the children of the testatrix's sister Ernestine Roedger who might be living at the time of the testatrix's death, and if any of her children should have died at that time the descendants of such child should receive the sum of $600. The will also gave a like legacy of $400, with the same limitations, to each of the children of the testatrix's sister Augusta Putsch. The fifth clause of the will bequeathed to Charles Maurer $1000 in trust, the income to be used for the perpetual upkeep of the testatrix's lot in Glenwood Cemetery, and to use such of the income as might not be necessary for the upkeep of the lot for purchasing flowers to be placed on the graves of the testatrix and her husband on Decoration Day and such other days as the trustee should see fit. The sixth clause gave to Charles Maurer, Anna Maurer and Mathilda Cook, or such of them as might survive the testatrix, the right to purchase all her bank stock at its book value at the time of her death, provided they, or any of them, should elect to purchase the stock at that price within six months after the testatrix's death. The proceeds of the sale, or the bank stock itself as to which the privilege of purchasing was not exercised, was to be turned over to the trustees named in clause 7 of the will. The seventh clause of her will devised the testatrix's real estate located in the south half of section 30 and in the north half of section 31, township 3 north, range 7 west of the third principal meridian, and in section 25, township 3 north, range 8 west, together with block 12 in Cohn's addition to Collinsville, and all of her bank stock or the proceeds thereof, as provided in clause 6 of her will, to Charles Maurer, Herman Metz and Irwin Maurer, trustees, in trust, to provide a site for the erection

of a non-denominational hospital in or near Collinsville, to be called "The Anna Forberg Cook Hospital," and also to provide a fund, the interest from which should be used in partially defraying the expenses of such hospital. The testatrix expressed the wish that her trustees should, if it was advisable, cause such hospital to be erected on one of the tracts devised to them, or if in their opinion it was not expedient to erect the hospital on those premises, then they might use a portion of the principal of the trust fund for the purchase of a suitable building site. The rents from the real estate and income from the other trust property, after the payment of taxes, insurance and repairs, were directed to be accumulated by the trustees as the nucleus of a fund for the erection of a modern hospital building until such time as the fund accumulated should be sufficient for the erection of a hospital or until a fund for such erection should be supplied by charitably inclined persons or by the city of Collinsville, it being understood that such hospital, however erected, should be called the Anna Forberg Cook Hospital. After the erection of the hospital the rents and interest received by the trustees should be used by them for the maintenance of the hospital, and in the event that the hospital building was erected by funds furnished by the city of Collinsville or others and a board of trustees or directors were appointed for the managing of the hospital, the trustees might pay the rents and interest received by them directly to such board of trustees or directors or themselves pay out the rents and interest for the use of the hospital, as should seem advisable to them. Other directions of the will in regard to the trust need not be stated. The eighth clause of the will directed the conversion of the residue of the testatrix's property into cash within one year after her death, and the proceeds, after the payment of debts, legacies and funeral expenses, to be paid over to the trustees named in clause 7, to be held by them on the trusts set forth in that clause. The ninth

clause authorized the executor to convey such property as he should sell under the powers conferred by the will. The tenth clause nominated Charles Maurer to be executor, and in the event of his death, resignation, removal or inability to act before the estate was fully settled, Irwin Maurer was nominated as his successor.

The will was written in the office of Springer & Buckley, lawyers practicing law in Edwardsville. Two members of the firm participated in the preparation of the will, E. C. Springer and his son, F. E. Springer, and both testified on the trial. From their testimony it appeared that they had written a previous will for Mrs. Cook in 1924. After it was executed it was left by her in the possession of the attorneys until she came to their office in 1925 to have the will now in question prepared and executed. She came to the office accompanied by Charles Maurer and his wife in August, 1925, saying that she came to change her will and stating the change she wanted. This was with reference to her relatives and to the hospital property. The former will, which had been executed the fall before, was in the possession of the attorneys in their safe. She made no change in reference to Carl Forberg, who was her brother's son. Besides her brother she had two half-sisters, but all three were dead. She wanted to make a change with reference to the sisters' children. The principal change she wanted was in connection with the hospital. In a former will she had willed a block of property in Collinsville to the Roedgers, and she wanted to change that and have a deed made and tendered to the city of Collinsville, because she wanted to get the hospital started while she was living. She wanted to give to the Roedgers money in place of that block. One of the Roedger boys, Frank, was to receive $1000 in the former will and the Collinsville property went to him and his brothers and sisters, so when she took the Collinsville property back for the purpose of making a deed to the city she gave each $600 and cut down Frank from

$1000 to $600. She wanted to treat them all alike. Then she gave each of the Putsch children $400, increasing it from $200, as it was in the former will. The attorneys went over the will with her and it was read to her after the change was made. The whole will was re-written. The first page, or the part referring to Carl Forberg, was the same as the first will. She then signed the will and requested the two attorneys to witness it for her. She had to come back the next day. What was done in the will was at the direction of Mrs. Cook. The language is in the phraseology of the younger Springer. It was read over to her the next morning and she said she was satisfied with it. She gave the information as to the contents of the will and it was drawn according to her intention. She discussed the will with the attorneys and went over with them her property and her relatives more in detail than when she made the first will. She gave a statement of her real estate, she knew where it was located, she knew what tracts she had and told them what should go to each one and what should go to the hospital. She also stated at that time what her personal property was. She said she was worth from $70,000 to $80,000, and she took great pride in it. She said, "Don't you think I have increased it a great deal since my husband died?" At the time she made this statement E. C. Springer testified that his best recollection was she said she had got in the neighborhood of $12,000 in personal property from her husband's estate, including moneys and interest. She said she had increased it from that up to $40,000. Except the changes mentioned the two wills were alike. When the first will was written Mrs. Cook was in the office, and she gave the attorneys the terms of the will and the younger man took a memorandum of what she wanted. They asked particularly what she wanted done, and that is where they got the information first as to what her husband left and how she had increased it. When the first will was written she was in the office all

the morning and the father and son both talked with her. When she came back to have the second will written it took all the morning. When she came back to sign the second will she was there long enough to read it and discuss it, probaby an hour or two. She was satisfied with what had been written. She had her own ideas and she wanted to carry them out. She was of sound mind and in talking with her she spoke very intelligently. She was positive in her statements.

Besides the two lawyers who prepared the will and witnessed its execution, whose testimony has just been referred to, thirty-six witnesses were called by the proponents, who were for the most part well acquainted with Mrs. Cook, many of them for many years, who were her neighbors or living in the cities of Collinsville and Troy, near which she lived and in which she did business. They included tenants, grain dealers, farmers, tax collectors and assessors, stock buyers, carpenters, merchants and tradesmen, physicians and bankers, people who had been acquainted with her and done business with her for the thirty years in which she had lived alone on the farm after her husband's death, managing it and increasing her fortune $40,000 or $50,000. Their testimony referred to the actual transaction of business from day to day during this period, the deposit of money in the bank and the withdrawal of it, the purchase of bonds, the sale of a railroad right of way through her farm, the lending of money and the collection of loans, the sale of grain and collection of rents, the repair of buildings on her farm and making of contracts for that purpose, without a scintilla of evidence containing a suggestion of unsoundness of mind or a lack of ability to understand or conduct to a satisfactory conclusion any of the transactions involved. She never kept a checking account at the bank but deposited her money, taking interest-bearing certificates for it, and she frequently had occasion to go to the bank to collect

the interest or the principal of the certificates or to make new deposits.

The contestants called twenty-four witnesses, who testified to isolated eccentric actions by Mrs. Cook, upon which some of them expressed opinions, more or less confidently, that she was of unsound mind. Six of them expressed no opinion as to her mental capacity. Some of them knew nothing of her business relations or transactions. Others had borrowed money from her or transacted business with her. None of them testified to any conduct or act having any tendency to show that she was not capable of understanding and transacting business or which indicated a lack of mental capacity. Several testified that if she actually did look after her own property and her own affairs herself it would not change their opinions, others thought it might. These unfavorable opinions of her mental capacity were based on alleged facts having nothing to do with the qualities required to make a valid will. It is claimed that for thirty-one years she lived alone on the farm with scarcely any food to eat, without sufficient heat in the house in winter; that she slept in a bed on which she used gunny sacks for sheets and sometimes slept on the floor; that she did not feed her stock enough in the winter; that she talked in a loud, high-pitched voice and her speech was rapid and very nervous and her conversation disconnected; that she made many gestures and would turn her back on persons to whom she was speaking and would talk with her face to the wall, making gestures; that she would take persons who called on her, sometimes entire strangers, through every room in her house, including basement and attic, and set chinaware and other articles on the floor for them to look at, until the floor was almost covered. Several of the witnesses for the contestants were related by blood or marriage to some of the contestants or to their counsel. The opinions of the witnesses that Mrs. Cook was of unsound mind were based not upon any conduct having any relation to business or

indicating any inability to remember the natural objects of her bounty or to recall to mind her property or to make disposition of it understandingly according to the purpose which she had in mind, but almost entirely upon conduct which was merely eccentric, odd, whimsical or capricious, having no tendency to show unsoundness of mind or to prove that she was unable to understand or transact ordinary business.

A person who is capable of transacting ordinary business is capable of making a valid will. (*Carnahan* v. *Hamilton*, 265 Ill. 508.) An unequal division of a testator's property among his heirs does not indicate a lack of testamentary capacity, and the fact that a testator related a dream about hidden treasure and said he believed he would find it is not ground for holding his will invalid where such fact in no way appears to have influenced him in making the will. (*Carnahan* v. *Hamilton, supra.*) The strongest evidence of a testator's soundness of mind and memory is positive testimony that he always transacted his ordinary business intelligently. (*Chandler* v. *Fisher,* 290 Ill. 440.) Eccentricity, miserliness, uncleanness, slovenliness, neglect of person and clothing, offensive and disgusting personal habits, do not constitute unsoundness of mind. (*Estes* v. *Clark,* 317 Ill. 585.) Mere infirmity and old age do not show want of testamentary capacity. (*Carnahan* v. *Hamilton, supra.*) Extreme age and feeble health, though combined with a defective memory and mental sluggishness, do not render a testator incapable of making a will, unless his mind has become so impaired that he is incapable of understanding the business of making his will while he is engaged in the act. *Blackhurst* v. *James,* 293 Ill. 11.

There is nothing in all the record to indicate that the testatrix did not know fully what property she owned, what it was worth and her financial condition, or that she was not fully aware of her relations to those who might be presumed to have some claim upon her consideration in the

disposition of her estate. The record is barren of anything to show that she did not have the capacity which the law required to enable her to dispose of her property by will for the purposes which she desired to serve. The will itself is sufficient evidence that she remembered who were the natural objects of her bounty, for it mentions all her relatives who would be her heirs; also she recalled to her mind her property. The real estate was specifically described in the will, the bank stock was mentioned, and there is no evidence tending to show that she did not comprehend what property she owned. Her desire to establish a hospital which should bear her name was shown to be the result of a fixed purpose which she had formed months before and had stated in her will made the previous year. Her reason for making the present will was shown to be the desire to have the site established and the hospital begun in her lifetime. The will was a simple one. Her purpose was not complicated. After recognizing the claims of her relatives to the extent she deemed proper, she desired her estate to be applied to the establishment of a hospital. In a sentence that was her whole will. Details as to the legal manner of carrying it out were properly supplied by the lawyers who wrote the will and were approved by the testatrix. She went to the lawyer who years before had assisted in the settlement of her husband's estate, laid the subject before him, and after he had prepared the will in accordance with her express wishes she executed it in due form of law.

It would consume much time to no good purpose to set out at length and discuss the testimony of each witness. Much of it is of no value. Superficial opinions based on casual impressions as the result of incidental conversations or observations on chance meetings are of little value, under any circumstances, in determining the question of testamentary capacity, and of no value against uncontradicted evidence that the testator has continuously for a series

of years conducted intelligently and successfully important business affairs. The verdict of the jury was manifestly against the weight of the evidence, and the circuit court should have sustained the motion for a new trial.

The decree is reversed and the cause remanded.

*Reversed and remanded.*