(No. 23138.

JULIA LANGWISCH *et al.* Appellees, *vs.* ADOLPH LANGWISCH *et al.* Appellants.

*Opinion filed October 24, 1935—Rehearing denied Dec. 5, 1935.*

HAROLD J. BANDY, for appellants.

C. W. TERRY, and M. D. POWELL, for appellees.

Mr. JUSTICE SHAW delivered the opinion of the court:

On March 1, 1932, Frederick Langwisch made his will which is the subject matter of this litigation and on January 12, 1933, he died. By the second paragraph of his will he gave certain real estate to his brother Otto. By the third paragraph he provided that in the event of Otto's death before his own the real estate should go to certain of Otto's children. In the fourth paragraph he devised certain other real estate in Edwardsville to Otto Langwisch, Jr., the son of his brother Otto, and in the fifth he directed that in the event of the death of Otto, Jr., prior to his own death, the real estate described in the fourth paragraph should go to Edna Langwisch and Verna Lang-

wisch. By the terms of the sixth paragraph certain real estate therein described was given to Edna Langwisch, a daughter of his brother Otto, with an alternative provision in the paragraph following, that in the event of her death in his lifetime it should go to Otto, Jr., and Verna Langwisch. The eighth paragraph devised the real estate described in it to Otto, Edna and Verna Langwisch in equal shares. The paragraph following gave one dollar each to his brother Frank Langwisch, his sister Julia Langwisch and his sister Frances Gueltig, no other provisions for them being made. The testator's brother Otto, his nephew Otto, Jr., and his nieces Edna and Verna, were the residuary legatees, and Otto Langwisch was named executor without bond. The deceased testator was a bachelor, and the relatives named in the foregoing statement of facts were his only heirs-at-law.

The will of Frederick Langwisch was contested in the court below on complaint, answer and replication and upon trial before the court without a jury. The substance of the allegations amounted to a charge of want of testamentary capacity and certain other allegations of fraud, deceit and undue influence, but upon the trial and this review no effort has been made to substantiate any of the charges except that of a want of testamentary capacity. There is no evidence in the record even tending to show undue influence, and that position is regarded by us as being abandoned. The trial court made a finding that the testator was not of sound mind and memory at the time the purported will was executed, and in accordance with that finding entered a decree setting it aside. The decree also, in accordance with a prayer of the complaint, impressed certain real estate with a trust in favor of the incompetent appellee, Julia Langwisch, in accordance with certain provisions of the will of her father, which had devised the property to Frederick Langwisch burdened with certain charges in her favor. None of the parties take any excep-

tion to that part of the decree but all agree that it shall remain in full force. The only questions presented are questions of fact concerning the weight of the evidence, which it will be necessary to review.

The contestants presented the testimony of twenty-one witnesses and the defendants thirteen. Of the twenty-one presented by the contestants two were incompetent to testify, as were also two of those presented by the defendants. For some reason not apparent of record, the parties stipulated before trial that no objection would be made to the competency of any witness, which has resulted in burdening the transcript with much that is of little or no probative value. The complainants Frank Langwisch and Frances Gueltig testified in their own behalf, as did also Charles E. Gueltig, the husband of Frances, and three of Frank's sons. The testimony of each of these witnesses was so colored and obviously biased as to be of no help to us. For the defendants two incompetent witnesses testified: Lena, the wife of Otto Langwisch, and Otto himself. Neither of them touched upon any point related to the testamentary capacity of Frederick Langwisch, and the evidence given by them requires no consideration.

The first competent witness for the complainants was Dr. Percy L. Noggle, an eye and ear specialist. He knew the testator between the years 1927 and 1931, and in 1930 had fitted him with glasses. He testified that he had frequently seen him on the streets, and indicated a peculiar manner of walk and movement of hands and arms which he said he had noticed but did not fix any definite period of time when he noticed it; that in March, 1930, he examined the testator's eyes and found practically no vision in one of them. The other one he said required a very large correction, as he found only twenty one-hundredths vision in it. He said he never was paid for his services or glasses, and gave it as his opinion that Langwisch was of unsound mind a year or two prior to the date of the

will. On cross-examination he testified that the eye treatment was the only business he ever had with the deceased, that he did not know anything about his business affairs or whether or not he personally conducted them, and that the opinion which he had given was based on observations between 1927 and 1930.

Edward H. Frank testified that he had known the Langwisch family for many years; that after 1928 he saw Frederick Langwisch rather frequently; that Langwisch frequently talked to himself, and that he thought at times his answers were not responsive to questions he had asked. He gave it as his opinion that he was not of sound mind and not able to transact business but did not fix any date. He also said that at one time he thought the trouble was St. Vitus dance; that "I figured maybe he didn't have the proper education," and also, "I thought he was intoxicated." On cross-examination he was unable to recall the last time he saw the deceased, but thought it was around 1930 or 1931; that he did not know what his mental condition was in March, 1932; that he never had any business transactions with him; that he never talked to him about his property, and that he never had any conversations with him about business affairs.

Katherine Staff testified that she worked in a bakery near the testator's home; that one day the testator came in and "started rambling" about his relatives; that he said he had paid for several cars the Gueltigs owned, and referred to them in obscene language and called them terrible names, and that he said that they were not going to get any of his money. She fixed the date of this conversation in 1929, and stated that she did not think Langwisch was of sound mind, because he was not drunk when he made the remarks. On cross-examination this witness testified that Langwisch always knew exactly what he wanted and was stingy and close about prices; that she never had any business transactions with him except to sell him cookies or

coffee cake, and did not know anything about his property or whether he looked after it himself, and that she did not know whether or not he was able to do that.

Sam V. Crossman, cashier of a bank at Edwardsville, was called for the complainants and testified that he had known the testator all of his life. He said that he was peculiar, that he was quiet, and that he would sometimes fail to respond to a greeting on the street; that he dressed ordinarily in clothing like work clothes; that he thought him a bit peculiar or incapable, but said he had no business transactions with him from which he could judge his mental capacity. This witness was dismissed without cross-examination.

James Flynn, twenty-two years of age, testified to the deceased having a staggering walk, waving his arms, mumbling to himself and being frequently drunk. Without fixing the date, he told of going to Langwisch's house one night at the latter's request; that Langwisch told him there was a "nigger" after him, but there was no nigger there. He gave it as his opinion that in the last two or three years of the deceased's life he was not of sound mind. On cross-examination he stated that Langwisch was drunk at the time he imagined some nigger was in the back of the house; that he never had any business transactions with him, and did not know whether or not he looked after his own property.

Clay Overstreet testified that he became acquainted with Langwisch in the spring of 1929; that he wore common work clothes that were not too clean, but the witness said he would not say that he dressed like a tramp; that he stuttered awfully bad, and that the witness "had to just stand there and kind of wait and let him get through with his words." The witness further testified to seeing Langwisch drunk in the fall or spring before he died, but stated that he did not form any opinion about his mental condition before March 1, 1932, the date of the will.

William L. Duckles testified that he was cashier of the Citizens State and Trust Bank until August, 1929, when it merged with the Edwardsville National, since which time he has been vice-president and trust officer of the new bank, and that Langwisch was a customer of the Citizens Bank and that witness at times waited on him. He said it was difficult to hold a conversation with him because he stammered, and that it was not often that he conversed with anyone in the bank at all; that the witness noticed a decided change in Langwisch's condition in the latter years of his life, which the witness believed was on account of hard liquor; that at one time the testator, accompanied by his brother Bill and Gueltig, came into the bank and there was some talk about an agreement whereby the witness would supervise Langwisch's checks and refuse payment of those made for liquor; that Langwisch's brother-in-law, Gueltig, typed out such an agreement but that Langwisch refused to sign it. The witness stated, however, that it was verbally agreed to and that he acted in that capacity. He testified that Langwisch spoke incoherently and that it was difficult to understand him because of his stuttering, and that he thought him below normal and not of sound mind and memory. On cross-examination he testified that Langwisch's brother-in-law, Gueltig, was a director in the bank in which the witness was cashier; that he had had very little conversation with Langwisch about business and never any business transactions with him except concerning his bank account, which had never been overdrawn; that he did not know whether or not Langwisch had personal control of renting his properties; that he thought his mental condition was at the worst in March, 1932, and then stated that he did not know whether or not he had seen him in March, 1932.

John Richter, an ex-bartender and ex-policeman, testified that he served on the police force of Edwardsville during the four years Gueltig, Langwisch's brother-in-law, was

mayor. He told of an occasion when Langwisch called the police, complaining, as the witness said, that there was a bunch of Jews down at his house stealing his chickens and furniture; that the witness, and another policeman who was not called to testify, responded to the call, and that the other policeman was of the opinion that the deceased had delirium tremens. Richter was unable to fix the date of this occurrence as being either before or after the date of the will, and expressly stated that he did not know whether or not the deceased was of sound mind during the last two years of his life.

Joe Appogast testified as to the deceased's peculiar manner of walking and dressing, and of an occasion when they met and the deceased failed to recognize him. Without fixing any date, he also told of an occasion when the deceased imagined someone was after him. He expressed the opinion that the deceased was of unsound mind during the last two years of his life, but further testified that he had never talked any business matters with him, never had any business relations with him, and did not know whether or not he looked after his own affairs.

Arthur C. Boeker also testified for the complainants, although his testimony rather favored the proponents of the will in its entirety. He was assistant cashier of the bank where the deceased kept an account and had a safety deposit box. He said that during the last two or three years of his life the deceased was able to handle his own business to a certain extent; that he had a bank account in his own name, upon which he wrote checks; that he usually asked for assistance when he went to his box, and would ask someone at the bank to hunt out the bonds upon which interest was due and have the interest deposited in the bank; that he drank to excess; that "I would hesitate to say that he was of sound mind and memory. I would hardly consider him qualified to transact the ordinary business affairs of life. I would question his ability to make

a competent disposition by will of his property. To the best of my judgment he was not competent." This witness was not cross-examined.

The next witness, Charles Hamor, appears to have formed his opinion that the testator was not competent because, as he said, he came along one day feeling pretty good and said to the witness, "I will just buy you a brick house some of these days," and the house was never bought or given. The date of the conversation was not fixed, nor was there any denial of the rather plain implication that Langwisch was in his cups at the time he made this statement. The witness also mentioned having seen the deceased wear some mittens and a big cap in June or July, but did not say whether this had occurred one or twenty years prior to his death. He said he drank lots of whisky, mostly a poor grade of "mule," and on cross-examination he admitted that he frequently drank with him; that on the occasions when the deceased was getting drunk on poor whisky the witness was also partaking; that he did not know what his reason was for saying that the deceased was not able to transact his business; that so far as he knew he did look after his own business; that he had a good many places to look after, and that he thought the deceased rented them himself.

T. P. Riley, a former tax assessor, alderman, chief of police, chief of the fire department and State fire marshal, expressed the opinion that the testator was of unsound mind, but upon cross-examination stated that he knew who his relatives were at all times, knew who would be the natural recipients of his bounty and knew what property he owned; that he was only erratic and irresponsible if drunk; that his brother-in-law, Gueltig, was mayor and the one who had appointed the witness chief of police and chief of the fire department. He further testified that Gueltig, while mayor, had given express orders that Langwisch was

to be locked up any time he was seen drunk, and that this happened two or three times.

Frank Spindler, who was chief of police from 1931 to 1933, testified to various erratic actions of the deceased, but stated that he would not know whether or not he had sufficient mental capacity to make a will.

Two doctors, H. C. Tietze and R. S. Barnsback, in answer to hypothetical questions expressed an opinion that the hypothetical man was not of sound mind, but the question to which they responded was such as to render their answers of little assistance to us. It assumed the existence of a large number of hallucinations during a period of two years prior to the death of the hypothetical man, all of which, so far as the question was concerned, might have been subsequent to the date of the will. It did not exclude the element of intoxication in connection with these hallucinations, nor did it take into account the extreme impairment of vision and impediment to speech under which the deceased labored. In referring to such matters as the hallucination that the deceased was being annoyed by Jews, negroes or others, the question did not, nor could it from the record, fix the time when these annoyances were supposed to have occurred.

A short review of the testimony of incompetent witnesses given under the stipulation above referred to will indicate its entire lack of value. Charles E. Gueltig, husband of Frances Gueltig, testified that the deceased was incompetent. From his evidence and other parts of the record it appears that the deceased lived for a number of years with his brother William, and that the two were very close. Gueltig relates quite a number of conversations which he claims to have heard between William and the testator, in each of which William was said to have addressed Frederick as "you old fool" or "crazy fool." Notwithstanding this fact, the record shows that William died leaving a substantial estate and in his will named the testator as

his executor. Much of Gueltig's testimony is devoted to a recital of various family conversations and references to the extreme drunkenness of the deceased. Without any indication of the means by which he procured the private information, he was prepared with a long list of checks drawn by the deceased in 1928, 1929 and 1930. It was claimed that the payees of most of these checks were "bootleggers," but they were mostly for insignificant amounts, and their total would constitute no serious drain on the resources of anyone of reasonable means. Gueltig's interest in the case and the value of his testimony will be considered further in connection with certain evidence offered by the proponents which will be summarized later in this opinion. The other interested witnesses expressed opinions adverse to the testator's mental capacity, but none of them stated any more substantial grounds than the witnesses whose testimony we have already set forth.

The first witness for the proponents was the attorney who drew the will, Lester Geers, State's attorney of Madison county. He testified that Langwisch came to the witness' office alone and told him how he wanted his will made, and that it was made according to his directions; that the witness made his own shorthand notes, and from those notes dictated the will directly to his secretary, who transcribed it; that he and his secretary, Irene Mueri, signed as attesting witnesses, and that as he left the office the testator said, "That sister of mine will sure have fits about this will." Geers testified that the testator was his only source of information for making the will; that he had known him all of his life and considered him of sound mind and to have had testamentary capacity at the time the will was made. He also testified that the testator was sober at that time and that he had never seen him drunk. The secretary, Irene Mueri, testified in substance the same as Geers.

James Waters, a deputy circuit clerk of Madison county and an attorney licensed to practice in Missouri but not in

Illinois, testified he had known the testator a good many years and knew him at the date of the will; that the testator employed him to serve a five-day notice for the eviction of one of his tenants who was in arrears in his rent; that the testator served the notice himself, and later told the witness that he did not think the tenant was going to get out, and the witness recommended having a constable serve another notice; that this was done and the tenant vacated the premises; that shortly after this transaction the testator met the witness on the street, told him that the tenant had moved, and that if he would come by the house he would pay for the services; that he went to the testator's house, where he received a check for his fee in the matter, which check was introduced in evidence. It bears date January 11, 1932, which is forty-eight days prior to the date of the will. This witness expressed the opinion that the testator was of sound mind and memory, and said that upon the two occasions he had seen him in connection with this business he had been entirely sober.

Fred Betzold, a constable, testified that in March and April, 1932, he was employed by the testator to collect a note in the sum of $500, payable to the testator and signed by his brother-in-law, Gueltig; that Gueltig claimed a set-off of $75 for legal services; that he saw Gueltig three or four times about the note, and that each time he saw Gueltig he had a conversation with the deceased; that the deceased agreed to the $75 set-off and Gueltig paid $425. The canceled note is not in evidence, but the receipt for the $75 signed by Gueltig bears date May 23, 1932. This witness expressed the opinion that the testator was of sound mind. He also testified that he knew him to be a man who drank, but that he never saw him so drunk as to be helpless.

Fred Rohrkaste, manager of a grocery store, testified to business dealings with the testator during January, February and March, 1932, and that in his opinion he was of sound mind during those months. He said he had seen

him drunk on one occasion years previously but had never seen him drunk in the store.

Walter Dees, who had known the deceased for thirty-five years, testified to conversations and transactions had with him six or seven months subsequent to the date of the will. The witness was on the membership committee of the Veterans of Foreign Wars and talked to the deceased, who had served in the Philippine insurrection, about becoming a member of the Edwardsville Post. He testified that he had various conversations with the deceased throughout the year 1932, and believed him to be of sound mind during that year and able to understand his business and affairs. He said that the deceased had given him the length of time and the places he had served on foreign soil, together with the dates, all of which were afterwards verified by discharge papers. He died before becoming a member.

George B. Worden, a bailiff in the court where this case was tried, had known Langwisch since 1918 and had business with him in August, 1932, pertaining to an application for pension. The witness testified that he saw him once every week or two throughout that year and considered him of sound mind.

Mayme Krage, who lived five doors from the deceased and was well acquainted with him and his family, testified for the proponents. She said she had talked with the deceased many times during 1932, and remembered particularly an occasion twelve days before his death, in 1933, when she called on him for his contribution to a fund for flowers for a neighbor's funeral; that he gave her a quarter and told her he was feeling pretty good; that she frequently bought fruit and garden stuff from him, and that she never saw him drunk or heard of him having "snakes" or hallucinations. It was her opinion that his mind was normal. Another neighbor, Pete Grode, who lived two doors from the deceased, testified that he had a sound mind; that he got drunk once in a while but spent most of his

time working around the garden and the yard. Likewise, Henry Heuiser, another neighbor, who had transacted some business with the deceased in 1932, testified that he was of sound mind in that year.

Concluding their case as to mental capacity the proponents produced William C. Straube, mayor of Edwardsville, who testified that he talked with the testator as often as once each week in 1932 and from his observations of him was of the opinion that he was of sound mind. This witness transacted business with the testator in connection with the funeral of the testator's brother William.

In rebuttal the complainants put Charles Gueltig on the stand to explain the transaction of the $500 note which the constable had collected. All that he testified to was that in December, 1929, at about the time of the financial depression, the deceased had some money which should be invested; that the witness told him that he could get three per cent at the bank and that the witness would give him four per cent, and that he gave the deceased a note for it, and that the deceased wanted him to invest it for him. He offered no explanation as to why it became necessary for the deceased to employ a constable to collect the note nor as to the nature of the legal services for which he had charged $75. Neither did he say anything about what his opinion was as to the deceased's mental condition at the time he borrowed the money at four per cent. We consider further comment on his testimony unimportant.

The law presumes every man to be sane until the contrary is proved, and the burden of proof rests upon him who asserts the lack of testamentary capacity. An absolutely sound mind is not necessary to testamentary capacity, it being sufficient if the testator have sufficient mental ability to know and remember who are the natural objects of his bounty, to comprehend the kind and character of his property, and to make disposition of his property according to some plan formed in his mind. (*Morecraft* v. *Fel-*

*genhauer,* 346 Ill. 415, and cases cited.) It is also established that neither the unreasonableness of a will nor the unequal disposition of the testator's property is of itself proof of a want of testamentary capacity. (*Carnahan* v. *Hamilton,* 265 Ill. 508.) An application of these long established principles makes it impossible for us to concur in the result arrived at by the trial court.

For the reasons indicated, that part of the decree of the circuit court of Madison county which set aside the will of Frederick Langwisch is reversed and that part of the decree which is not complained of in this court and which impressed certain real estate with a trust in favor of Julia Langwisch is affirmed. The cause is remanded to the circuit court of Madison county.

*Reversed in part and remanded.*