(No. 32240.— )

ELMER LOGSDON *et al.*, Appellants, *vs.* RAY LOGSDON, Exr., *et al.*, Appellees.

*Opinion filed March 20, 1952.*

SCHMIEDESKAMP & DEEGE, of Quincy, GARRISON & CRANDALL, of Rushville, and C. G. COBURN, of Virginia, for appellants.

HARDIN E. HANKS, and F. W. REITHER, both of Beardstown, for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This appeal comes directly here from the circuit court of Cass County, where the chancellor, hearing the cause without a jury, sustained the validity of the will of Curtis Logsdon, deceased. Suit was brought by Elmer Logsdon, son of Curtis Logsdon, claiming mental incapacity on the part of his father and undue influence on the part of Louise Logsdon, his stepmother, and Ray Logsdon, his brother. Later Fay Logsdon Ross, a daughter of decedent, became a party plaintiff.

The will in question was executed on February 16, 1950, bequeathing Louise Logsdon $3000 and a monthly income of $60 so long as she remains testator's widow. The testator gave to his son Elmer Logsdon $500 and to his daughter, Fay Ross, a like sum. All the remainder of his estate went to his only other child Ray Logsdon, whom he appointed executor.

The decedent, who was 67 years of age at the time of his death, had been a robust, enterprising and successful businessman and farmer. He was engaged in selling sand and gravel, in construction work involving the building of

piers in the Illinois River, also in buying, feeding and selling cattle. His two sons, Elmer and Ray, and his son-in-law, Ray Ross, co-operated with decedent most industriously and loyally for many years. They worked for meager wages and contributed considerably to their father's success in business which resulted in the accumulation of a small fortune estimated at the sum of $175,000. The mother of the three children died, and Curtis Logsdon, after remaining a widower for many years, remarried on March 27, 1945, to his present widow, Louise Logsdon. Prior thereto, an antenuptial contract was entered into providing among other things that all his property should descend to his children, except that Louise was to receive $3000 in lieu of any and all rights she might have in his estate as widow or otherwise. It is the contention of the appellants, that under the antenuptial agreement they became third-party beneficiary donees of the property owned by Curtis Logsdon, and that by the terms of the will they were deprived of those rights.

The children were apparently dissatisfied with the remarriage of their father, and this, added to various financial disputes, resulted in the termination of their business relationships with their father. Each child received $6000 in consideration of which they relinquished to their father all their interest in his business. This occurred sometime in July, 1946. Thereafter, the father appeared hurt and disturbed as a result of this disagreement. The son Ray then regained his father's confidence and good will, and their reconciliation led to the formation of a new partnership. There is much uncontradicted testimony that Ray treated his father abusively and disrespectfully. The other children, Elmer and Fay, never became reconciled with their father and refused to visit him during his last illness in the hospital.

Twenty-one witnesses testified on behalf of the plaintiffs and twenty-three for the defendants. It would serve no

useful purpose to detail the testimony of the forty-four witnesses, but, instead, we shall outline the salient aspects of the proof. Curtis Logsdon enjoyed good health until the last few years of his life when he suffered with arteriosclerosis. Dr. Robert Burley was Logsdon's family physician from June 29, 1949, until decedent's death on March 18, 1950. He testified that Logsdon was suffering from arteriosclerosis complicated with nephritis; that he had shortness of breath and high blood pressure; that heart tones were loud with irregular beats; that there was considerable edema in ankle and knee; that during his stay in the hospital he was given sleeping medicine and morphine; that the immediate cause of his death was coronary occlusion, nephritis being a contributing factor. Dr. Burley further testified that he made numerous tests indicating that Logsdon's heart condition was entirely local and that the brain was not involved; that on the morning of February 16, 1950, he was called to decedent's home and found that he had suffered a rather serious heart attack during the night; that he directed that he be taken to the hospital; that though his sickness was very acute he was always rational and mentally alert.

The record further discloses that Logsdon directed his son, Ray Logsdon, to notify his attorney, R. L. Northcutt, to come to the hospital to prepare his will. Northcutt had been decedent's attorney for years. In 1948 Logsdon had discussed with Northcutt the same subject, and the plan of distribution of his estate as discussed at that time was essentially the same as the one contained in the present will. It was during the afternoon of February 16 that Northcutt visited Logsdon in his room at the hospital, where he received directions as to the contents of the will which he was instructed to prepare. He also asked Northcutt to bring Charles K. Dutch, cashier of the First State Bank of Beardstown, and G. LeRoy Hagener, cashier of the National Bank of Beardstown, that they might sign

as witnesses to his will. In the evening of February 16, Northcutt and the two bankers went to the hospital where the will in question was duly executed. The testator's oldest brother, Louis, was also in the room at the time. They all testified that Logsdon talked pleasantly and coherently throughout this visit which lasted about one-half hour; that his mental condition was the same as it always had been; and, further, that Ray Logsdon took no part in the proceeding. The testator remained in the hospital twenty-three days, and after returning home for one week he suffered another attack, which resulted in his death on March 18.

Eleven of the witnesses who appeared for the plaintiffs testified that the decedent was not in his right mind. The opinion of a nonexpert witness that a testator is of unsound mind is entitled to little weight unless his opinion is predicated upon facts and circumstances that induce a reasonable belief of mental incapacity. Let us examine the testimony of the various witnesses appearing for the plaintiffs for the purpose of ascertaining facts and circumstances that prompted them to formulate their conclusions. One witness said "he was a terribly sick man. He kept repeating things. I could tell he was not rational." Another, "I talked with him about farming and other things; he seemed to know me; talked about buying a caterpillar tractor to clear some land; he asked three or four times about the day of the week and month; looked like he had been doped and wanted to sleep." Another, "visited him at hospital—talked about buying a tractor and unloading some barges, Ray told him to forget ·the business; his mind and memory seemed bad; he was a very strong minded man." Another, "that I wasn't able to make him understand when I wanted to trade him two ducks for one box of shells but his wife got the shells for me." Teddie Logsdon, a younger brother of testator, testified for the plaintiffs. He said Curtis had picked a lot of black-

berries in 1947, and that Curtis said he had to do so because Ray had not given him anything for two years. Another witness testified to like effect—that Curtis had picked 100 gallons of blackberries in 1947, and that he had given away most of the berries to various members of the family. Another witness testified that he visited Curtis in the hospital and that "he did not seem to hang with anything very long, he would change subjects, he rambled on from one thing to another—in my opinion he was not in his right mind on account of being worried."

The foregoing is fairly representative of the proof adduced on behalf of plaintiffs touching the issue of mental capacity. It is observable that there is little in the foregoing that would induce the belief the testator did not have sufficient mental capacity to make a valid will. The ineffectiveness of those witnesses is further accentuated by the fact that most of them were close friends or relatives of the family and had an interest in the litigation. Their interest seemed to arise from a feeling that the testator should not have favored one child to the disadvantage of his other two children, the present contestants; that all three children had assisted materially in the accumulation of his estate; and that all three should have shared equally in its distribution. It is not at all strange that they entertained such a feeling of injustice, and there is no doubt that their sympathies prompted their conclusion that Curtis Logsdon was not in his right mind.

Twenty-three witnesses appeared for the defendants. In the main they were lawyers, doctors, nurses, bankers and businessmen and for the most part completely disinterested in the result of the litigation.

Without contradiction, the record shows that decedent transacted his own business, involving both large and small items, up until his going to the hospital on February 16, 1950. On January 16, 1950, he purchased land from one Roy Cole for the sum of $1000. On February 6, 1950, he

and Ray Cline made a trip to Peoria at which time Logsdon was honored as the champion corn raiser of Cass County. On February 14, 1950, the testator wrote a check to the Chicago Gravel Company for $564.80. On February 16, 1950, the day the testator executed his will, he wrote two checks, one to Lincoln Crushed Stone Company for $3415.21 and the other to the Stanwood-Hillson Corporation for $47.97. On February 16, 1950, he instructed his brother, Louis Logsdon, to repair the room at the home place and also inquired as to furnishing sand and gravel for a contract job that Louis Logsdon had on the bank building at Meredosa. On February 19, 1950, he inquired as to the cost of the shingles on the home place and how the bank job was progressing. On that same day the testator asked his sister about one thousand pigs she had on her farm and inquired why the rest of the family had not come to see him. On February 21, 1950, Lodgsdon executed two bank signature cards which were witnessed by Dr. Burley, and on March 8, 1950, he executed a judgment note payable to the First State Bank in the sum of $5000. On March 15, 1950, just three days before he died, he sold hogs to the Mid-West Order Buyers of Chapin, Illinois, for the amount of $445.13. March 16 the testator wrote a check to Louise Logsdon in the sum of $25. Between the period of November 2, 1949, and March 16, 1950, the testator wrote checks in the amount of $12,543.26. Such a factual picture leaves little doubt in the minds of anyone but that the testator was possessed, at the time in question, with those faculties essential to transact ordinary business. He was exceedingly active right up to the time of his death. It has been repeatedly held that one who is capable of transacting ordinary business affairs in which his interests are involved is capable of making a valid will.

Arteriosclerosis may or may not result in mental deterioration, and mental disturbance may or may not reach the stage where one loses his capacity to make a valid will.

An appearance of being very sick, and failure to recognize someone, do not necessarily indicate a failure of mental power. Sickness, infirmity and old age do not render a person incapable of making a will unless he is incapable of understanding his business at the time he is engaged in making his will. *Schmidt* v. *Schmidt,* 201 Ill. 191.

Unreasonable prejudice against the natural object of one's bounty is not ordinarily ground for invalidating a will. The testator has the unquestioned right to dispose of his property as he thinks best, and the fact that it is divided unequally between those who have claims on his bounty does not necessarily impair the validity of the will. The record discloses very little proof on the issue of undue influence and conspiracy. The wrongful influence that must be established must be operative at the time the will is made. It is true that Ray was actively assisting his father in conducting the various enterprises that comprised their partnership. The record is completely barren of any proof that Ray· exercised any influence upon his father at the time he dictated the terms of his will to the lawyer or a few hours subsequently when the instrument was executed. The proof does show that Ray called the lawyer for his father to write the will in question, and that he was not far away at the moment of its execution, and doubtless there was present an opportunity for Ray to have improperly influenced his father. Mere opportunity is not enough to show the exercise of wrongful influence.

For six days the trial judge observed and listened to the forty-four witnesses appearing in this case. The vantage ground of a trier of facts over a reviewing tribunal is well recognized. There are instances of improbability appearing in the testimony of certain witnesses. A studied analysis of those witnesses by a trial judge, observing their demeanor, interest, candor and lack of it, could very easily lead to the determination that their testimony was not

worthy of belief. The chancellor was very liberal in his ruling on the admissibility of evidence. He heard everything that properly threw any light upon the issues presented. The conclusions that he reached on the factual questions are not contrary to the weight of the evidence.

As hereinbefore noted, it is claimed by appellants that, by reason of certain provisions of the antenuptial agreement contract, Elmer Logsdon, Ray Logsdon, and Fay Ross, the children of Curtis Logsdon, became third-party beneficiary donees of the property owned by Logsdon, subject to the rights of the widow under the contract. The pertinent provisions relied upon by appellants are paragraphs 13 and 14 of the contract: "(13) It is further understood and agreed by and between parties hereto that all property of said Party of First Part shall descend to his children, Ray Logsdon, Elmer Logsdon and Fay Ross, subject to payment to be made to party of second part as herein specified. (14) In event child or children is born as issue of contemplated marriage between parties hereto, in such event said child or children shall inherit equally with present living children of Party of First Part in all property acquired by Party of First Part subsequent to said marriage; it being the intention of both of the parties hereto that the said three children of said party of first part are to inherit all the property of the said Curtis Logsdon now owned by him, and share equally in all property accumulated and acquired in the future by the said Curtis Logsdon whether any children are born as the issue of said contemplated marriage between the parties hereto, or not."

It is asserted by appellees that a complete answer to appellants' contention can be found in the following provisions of said contract: "(6) Party of First Part, has the right and authority, as fully, and in all respects same as he would have if not married, to use, enjoy, manage, con-

vey, mortgage, grant, alienate, and dispose of all and every part of his property, including right and power to dispose of same, by last will and testament. * * * (10) It is further agreed nothing herein shall be construed to be a bar to either party to this agreement, giving any property which may be possessed to the other party by will or otherwise. It being understood each party shall control their personal estate, the same as either could do if no marriage relation existed between them. (11) It is understood by and between parties hereto in event of death of said party of first part his property shall pass according to his will, in event he dies testate and if he dies intestate then under laws of Illinois, same as if he died without leaving a wife surviving him."

A reading of the contract in its entirety demonstrates that the parties thereto did not contemplate surrendering their respective rights to control and dispose of their separate property in accordance with their own selection and wishes.

The agreement entered into between the testator and his fiancee prior to their marriage discloses an intention upon the part of the contracting parties that each shall hold their own property as though unmarried, free from any claim, charge or inheritance of each other. We are of the opinion that the children of Curtis Logsdon acquired no rights under this instrument as third-party beneficiaries. It was not entered into for their direct benefit. *Carson Pirie Scott & Co.* v. *Parrett,* 346 Ill. 252, 257; *Wolf* v. *Schwill,* 289 Ill. 190, 192; *Cherry* v. *Aetna Casualty & Surety Co.* 372 Ill. 534, 540; *Fodge* v. *Board of Education, Oak Park,* 309 Ill. App. 109, 116.

In the light of the foregoing analysis, it is our opinion the decree entered herein should be, and it is, affirmed.

*Decree affirmed.*