(No. 33462.—

JOHN ROLLER *et al.*, Appellants, *vs.* CARL KURTZ *et al.*, Appellees.

*Opinion filed September 23, 1955—Rehearing denied Nov. 21, 1955.*

LYMAN S. MANGAS, EDWIN C. MILLS, and LUTHER DEARBORN, all of Lincoln, for appellants.

HARRIS & HARRIS, of Lincoln, (HOMER B. HARRIS, THOMAS M. HARRIS, and HOMER B. HARRIS, JR., of counsel,) for appellees.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

John and Jacob Roller brought suit in the circuit court of Logan County to contest the will of their deceased sister, Anna Sheets, on the ground of mental incapacity and insane delusions. Jacob subsequently died, and his son, Edwin, was substituted as a party plaintiff and as administrator of his estate. A verdict was returned upholding the will, a motion for new trial was overruled, and a decree was entered in accordance with the verdict. A freehold being involved, plaintiffs appeal directly to this court. They assign as error that the verdict is against the manifest weight of the evidence, that improper instructions were given to the jury, and that a special interrogatory was not submitted to the jury until after the general verdict was returned.

Anna Sheets was sixty-four years of age at the time of her death. She resided on a farm about six miles southwest of the city of Lincoln. The farm and improvements were part of a 400-acre tract originally owned by her father, who died in 1929 or 1930, and her two brothers lived on the other two sets of improvements located on the tract.

She and her two brothers each owned an undivided one-third interest in the land, and although there had never been any division by deed an arrangement had been made whereby each farmed a separate portion of the tract. The house in which Mrs. Sheets resided was badly in need of paint, and the interior was so full of boxes, barrels, furniture, dishes, clothing and various other objects that there was only a path left from the bed to the stove and to another room. The balance of the floor was cluttered up with boxes, rubbish and other articles. On October 15, 1951, she fell near the mail box at her home, and fractured her hip. She was taken to a hospital in Lincoln, where she remained until her death on March 17, 1952. Her husband had died about six months before her accident. He had been bedfast for many months prior to his death, and Mrs. Sheets was his only nurse and attendant.

Following the illness of Mr. Sheets, defendants Carl Kurtz and his son, Donald, rented and farmed the land which Sheets had farmed. They lived in their farm home about one mile from that of Mrs. Sheets, and on occasion brought food to her. While she was in the hospital Carl Kurtz visited her and brought her mail, and he and his son, Donald, looked after her farm property. For many years prior to the accident Anna Sheets had been afflicted with diabetes; and her death resulted from the broken hip and her general diabetic condition, which progressively deteriorated during the last several months of her life.

The testatrix had no children, and left as her only heirs her two brothers, John and Jacob Roller, the original plaintiffs herein. In addition to her one-third interest in the 400 acres of farm real estate she owned an undivided one-third interest in approximately 38 acres of land, which was not disposed of by the will. Her estate also included about $11,385 in cash, farm equipment and other personal property. By her will, which was executed ten days after she entered the hospital, she gave the sum of five dollars each

to her two brothers and her nephew, Edwin Roller. Her farm land was devised to Donald Kurtz and his wife, Blanche. She gave her United States Savings Bonds to Blanche Kurtz, and her household furniture, farm equipment and other chattels to Donald Kurtz and Carl Kurtz. Her bank account, shares of stock, cash and notes were given to certain relatives of her deceased husband. The will was admitted to probate by the county court of Logan County on May 27, 1952, and letters testamentary were issued to defendant Carl Kurtz, the executor named therein.

The issues of unsoundness of mind and insane delusions were tried before the jury. By their general verdict and their answer to a special interrogatory the jury found that Anna Sheets was free from any insane delusion and that the writing in question was her last will and testament. Plaintiffs insist the verdict is contrary to the manifest weight of the evidence, and that is the principal question argued in the briefs.

Twenty-five witnesses were called on behalf of the plaintiffs, eleven of whom expressed an opinion that Mrs. Sheets was not of sound mind. Esta Beaver was a nurse in charge of the third floor of the hospital from three o'clock in the afternoon until eleven at night during the period Mrs. Sheets was in the hospital. She testified that Mrs. Sheets used profanity, and frequently struck or scratched the nurses and tried to bite them. Mrs. Sheets thought they were trying to steal from her, and would yell out to the nurses to come in and remove persons in the room who were trying to kill her, although there was in fact no one in the room at such times. During the first few weeks of her confinement she stated to the witness that her brother, Jake, and her nephew, Edwin, were stealing her corn and chickens; that they had always tried to steal from her; and that she had fixed the will so they could have nothing. She also accused the minister in charge of the hospital of having tried to steal from her, and she

referred to the nurses as whores. The nurse further testified that Mrs. Sheets thought someone was stealing chickens and she could hear them squawking from her room as they tried to steal them. Four other nurses and a nurse's aid testified to similar incidents. They related that testatrix had a constant fear people were trying to harm her and steal from her; that she would look in all directions and warn the nurses they were coming; that her conversation was loud and incoherent; that she was a very difficult patient to handle; that she would throw her nightgown and bedclothes to the floor; that it usually required three or four persons to change her bed and they had to do it by force.

A farmer acquaintance of Mrs. Sheets, who had known her all his life, testified that he visited her home during the illness of her husband; that there were a number of pasteboard boxes piled up on the floor and sideboard, leaving only a path to the bed; that Mrs. Sheets showed him the inside of the door, which had been chopped away, and told him people had been trying to break in with a corn knife; but that there were no marks on the outside of the door. Mrs. Sheets also told him that every afternoon a car drove by, leaving men out who would pass her window and go into the barn, and that she sat in the house with a shot gun practically all night for fear they would break in. During a visit with Mrs. Sheets in the hospital around November 6 or 7, she told the witness that the nurses would go out all hours of the night with men, and that she followed them out by the city dump and hid in the weeds. The witness had visited her many times in the hospital, and testified that in his opinion she was not of sound mind.

Other witnesses testified to statements by testatrix that people tried to enter her home at night and used some kind of sharp instrument to pry from the outside, although there was no damage to the outside of the door and the

scratches and cuts were on the inside. A teacher friend who visited her in the hospital around Thanksgiving Day, testified that Mrs. Sheets thought she saw turtle doves sitting up in the 'corner of the room and told the witness she watched them all day making love to each other. Mrs. Sheets warned the witness about reindeer rushing up and down the hall, and told her that one of them had chased her up a telephone pole, that she had to sit there all day, and that she would have starved to death if Mr. Kurtz had not given her a sandwich.

Other friends who had visited Mrs. Sheets in the hospital testified that as they were about to leave she told them she didn't think the dogs would bother them because they were tied up but they would have to be careful going out on account of the boxes and things piled up around the place, and that Mrs. Sheets evidently thought she was then at her home; that she failed to recognize friends she had known for many years; that she was angry at her brothers and felt they were stealing things from her; and that she praised Kurtz and said she would trust him with anything.

A psychiatrist and a psychologist, neither of whom knew or examined Mrs. Sheets, each answered a hypothetical question embracing many facts in evidence. They testified that the woman described in the question was of unsound mind and mentally ill; that her hallucinations were of a permanent type; that the collection of many items in the house and the clutter of such articles generally mean an attempt to obtain security, and constitute a reaction of feelings of insecurity; that barricading herself against imagined enemies, and the inconsistent distrust and suspicion of people, indicate a general deterioration of reasoning functions; and the process of imaginery visions and delusions shows the acute nature of her mental breakdown.

The defendants called sixteen witnesses in their behalf, fourteen of whom expressed an opinion that Mrs. Sheets

was of sound mind and memory. The periods of their acquaintance with Mrs. Sheets ranged from two to fifty years. The attorney who prepared the will testified that in 1950 he had prepared her income tax return from certain memoranda furnished by her; that on October 23, 1951, he went to the hospital at her request and remained in her room for about an hour. During that time she told him she wished to make a will, and informed him in detail about the identity of her nearest relatives, the extent and nature of her assets, and the provisions she wanted in her will. From the information thus obtained the attorney drew the will; and on October 25, 1951, he brought it to the hospital for her signature. He was accompanied by Howard Bushell, Dr. Boyd Perry and Dr. Robert Perry, who were to act as witnesses. At Mrs. Sheets' request he read the entire will to her in the presence of the witnesses. After reading the will, the attorney asked her if that was what she wanted, and she replied it was. After it was signed and witnessed, Mrs. Sheets asked the attorney to keep it until she came for it. He thereafter placed the will in his bank deposit box, where it remained until after Mrs. Sheets' death. The attorney testified further that in his opinion Mrs. Sheets was capable of transacting ordinary business and was of sound mind and memory.

The subscribing witnesses, Howard Bushell, Dr. Robert Perry and his uncle, Dr. Boyd Perry, each testified in detail as to conversations with Mrs. Sheets, and expressed the opinion that she was of sound mind when the will was executed. The two doctors had been her attending physicians for many years, and had seen her professionally between 40 and 50 times prior to her entry into the hospital. After she entered the hospital Dr. Boyd Perry saw her at least once a day. He testified that she had been violently inclined, had been profane toward the nurses, and was very eccentric. Dr. Robert Perry testified that during the latter months of her illness her temperature began to go up, and

she became confused and difficult to manage. A number of other witnesses, including the credit manager of the hospital, a nurse, a vice-president of the Logan County Farm Bureau, a former mayor and county treasurer, a mail carrier, and a mortician, testified to conversations with Mrs. Sheets and the transaction of various items of business with her. Almost all of them expressed the opinion that she was of sound mind on or near the date the will was executed.

Plaintiffs' evidence undoubtedly tends to support their claim that Mrs. Sheets was not of sound mind; but the testimony on behalf of defendants, on the other hand, tends to prove she was mentally capable of executing a will. Where the evidence is conflicting, the witnesses on opposite sides having testified to opposite conclusions, it is the peculiar province of the jury to determine which set of witnesses was right and which was wrong. A decree approving the conclusion of the jury under such a state of the evidence will not be disturbed on appeal. (*Sterling* v. *Dubin,* No. 33406; *Mitchell* v. *Van Scoyk,* 1 Ill. 2d 160.) As we observed in *Carney* v. *Sheedy,* 295 Ill. 78, the rule is that "where there is a contrariety of evidence and the testimony by fair and reasonable intendment will authorize the verdict, even though it may be against the apparent weight of the evidence, a reviewing court will not set it aside." The reason for such rule is found in the advantages possessed by the trial judge and jury, who see the witnesses and hear their testimony. The jury may and should take into consideration the demeanor of the witnesses and many other factors determining the weight and credibility to be given the testimony. The opportunity to observe and consider such matters is not available to a court of review, which only reads a transcript of the testimony.

In the case at bar eleven witnesses expressed an opinion that Mrs. Sheets was of unsound mind. Six of them—

namely, four nurses and two expert witnesses—had never known her before she entered the hospital. Two of the nurses did not become acquainted with her until after the will was executed; and many of the incidents or remarks related by the witnesses occurred during the latter months of her illness when her condition was admittedly worse. Neither of the expert witnesses had an opportunity to observe Mrs. Sheets during her lifetime, and the hypothetical question propounded to each assumed the existence of numerous statements and events as to which no time was designated. The evidence shows that many of them in fact occurred after execution of the will. It is well settled that unless proof of mental incompetency relates to the time of making the will it is of little value. (*Shevlin v. Jackson,* 5 Ill. 2d 43.) The testimony of the attorney who prepared the will shows that she knew the natural objects of her bounty, knew who her heirs or nearest relatives were, and knew the nature and extent of her property. Other witnesses testified to facts showing she paid her own bills and took care of her other business affairs without the assistance of anyone.

One who is able to transact ordinary business, to remember who are the natural objects of his bounty, to recall to mind his property, and to make a disposition of it understandingly according to some purpose or plan, is capable of making a valid will. (*Shevlin v. Jackson,* 5 Ill. 2d 43; *Forberg v. Maurer,* 336 Ill. 192.) To have testamentary capacity a testator is not required to be absolutely of sound mind in every respect. (*Langwisch v. Langwisch,* 361 Ill. 632.) An insane delusion that will avoid a will must affect or enter into the execution of the will; and even if the testator has an insane delusion on certain subjects, still if he has mental capacity to know his property and the objects of his bounty, and to make a disposition of his property according to a plan formed by him, the will cannot be set aside on the ground of mental incapacity.

(*Pendarvis* v. *Gibb,* 328 Ill. 282.) A mental disturbance, therefore, may or may not reach the stage where one loses his capacity to make a valid will; and a failure to recognize someone, and an unreasonable prejudice against the natural objects of one's bounty, do not necessarily indicate a failure of mental power. (*Logsdon* v. *Logsdon,* 412 Ill. 19.) The law presumes every person to be sane until the contrary is proved, and the burden was on the plaintiffs to prove by a preponderance of the evidence that the testatrix was mentally incapable of making a will at the time it was executed. The evidence in the present record is conflicting; and that introduced on behalf of defendants is sufficient to justify the verdict in their favor. We would not be warranted, therefore, in reversing the decree.

Objection is made to the giving of defendants' instructions 9 and 6, concerning the presumption of sanity. By instruction 9 the jury was told to presume in the first instance that Anna Sheets was of sound mind and memory at the time she executed her will, and to so presume until they believe by the preponderance of the evidence that she was otherwise. Instruction 6 told the jury that "to justify a finding that the testator, Anna M. Sheets, was not of sound mind and memory in the making of her purported will, the evidence must preponderate in favor of unsoundness of mind, and the presumption of sanity must prevail if the evidence is only sufficient to raise a doubt as to her sanity." It is argued that in view of the present practice, under which the contestant must proceed in the first instance with proof to establish invalidity of the will, the effect of the instructions was to require the jury to eliminate from their consideration all the testimony on behalf of the plaintiffs which related to facts occurring prior to the execution of the will; that by these instructions the jury were told at the close of all the evidence that the presumption of sanity was then in full force and effect; that they might well have believed it was an irre-

buttable presumption; and that when there is any evidence which tends to show insanity the presumption disappears. In substance the contention, apparently, is that under the present practice, with the burden of proof on the contestants, it is improper to give an instruction on the presumption of sanity.

We think the jury could not have been misled by the instructions objected to. They did not tell the jury to ignore any of the plaintiffs' evidence nor do they imply that the presumption is irrebuttable. The contention of plaintiffs is clearly without merit. It is well settled that the law presumes every person to be sane until the contrary is proved, and that the burden of proof rests upon the party asserting a lack of testamentary capacity. (*Innis* v. *Mueller*, 403 Ill. 11.) In *Meyer* v. *German*, 407 Ill. 400, we upheld instructions that the law presumes a person who has arrived at years of discretion to be of sound mind and memory until the contrary is shown; and we stated that "a jury should be admonished very carefully and particularly on this subject and charged to follow the presumption unless the contrary was proved." We further observed that "A case which has been fairly tried, and where the appellant has not been prejudiced by the giving of any instruction, should not be reversed because of some technical nicety in argument conjured in the minds of counsel for the appellant." Such observation applies with equal force to the case at bar. Plaintiffs have failed to show any error in the giving of defendants' instructions 9 and 6.

Plaintiffs also object to the giving of five other instructions on behalf of defendants, and to the failure of the court to submit in proper time a special interrogatory which required the jury to find whether the testatrix was of sound mind and memory and free from any insane delusion. It would unduly prolong this opinion to set forth the various other instructions complained of. We have carefully examined each of them and have considered the

arguments made by the plaintiffs with reference thereto. None of such instructions appears to be erroneous, and plaintiffs have not shown they were in any way prejudiced thereby. The special interrogatory was apparently not submitted to the jury before the general verdict was returned. When the verdict was brought in the court discovered the omission, furnished the jury with a form for the special interrogatory, and directed them to retire to the jury room and answer it. The jury accordingly retired again, signed the special interrogatory and returned their finding. The general verdict first returned was consistent with the jury's subsequent answer to the special interrogatory. Plaintiffs have failed to cite any authority for their contention, nor can we see how they could have been prejudiced. It is clear that under the circumstances of this case the failure to submit the special interrogatory before the jury first retired does not constitute reversible error.

After a careful examination of this record we conclude the plaintiffs had a fair trial, the verdict is not contrary to the manifest weight of the evidence, and no reversible error has been shown. The decree of the circuit court of Logan County is therefore affirmed.

*Decree affirmed.*